## THE HAVANA.

## THE CITY OF DALHART.

## NEW YORK & CUBA MAIL S. S. CO. v. UNITED STATES.

### No. 301.

Circuit Court of Appeals, Second Circuit.
April 5, 1937.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New York City, of counsel), for appellant.

Leo J. Hickey, U. S. Atty., of Brooklyn, N. Y. (Charles E. Wythe, Sp. Asst. to U. S. Atty., of New York City, of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The libelant, New York & Cuba Mail Steamship Company, was chartered owner of the steamship Havana, and the respondent, United States, was the owner of the steamship City of Dalhart. On August 28, 1934, the Dalhart came to Morse's Dry Dock in Brooklyn, N. Y., in order to undergo engine repairs. Inasmuch as two of her cylinders had to be lifted out and taken to the yard, she was moored with her starboard side on the south side of Pier 4 and stern-in so that she would be abreast of a crane that was to be used to lift out the cylinders. She was 401 feet long and when moored her bow extended about 50 feet beyond the pier end and out into the open seaway. To the stern of the Dalhart, libelant's steamship Havana, of the length of 413 feet, was moored with her port side along the south of the pier and her stern about 20 feet inshore from the stern of the Dalhart. Thus the vessels lay stern to stern and only about 20 feet apart.

The pier was an open one affording no protection, where the Dalhart lay, from north or northeast winds. The Havana, lying farther in the slip, was protected from such winds by a floating dry dock on the north side of the pier. Because of the exposed position of the Dalhart and a windstorm of unusual velocity she broke away from her moorings at about 9:30 p. m. on the evening of September 8 and drifted against the stern of the Havana, as a result of which the latter sustained damage. The gale reached a force of 78 miles per hour between 8 and 9 p. m. and of 73 miles between 9 and 10 p. m. During the height of the storm the velocity of the wind was said to have been the maximum ever recorded for the month of September. The storm did not, however, come without notice of its approach, for at 10:30 p. m. on September 7, the Weather Bureau issued the following warning:

"Hoisted northeast storm warnings 10:30 P. M. north of Virginia Capes to Sandy Hook; change to hurricane warnings south of Virginia Capes to North City, North Carolina." At 9 a. m. on September 8 the following was issued: "Hoist northeast storm warnings 9 A. M. north of Sandy Hook to Eastport, Maine. Tropical disturbance about 65 miles southeast of Cape Henry, Virginia, moving rapidly between north and north northeast, attended by shifting gales and winds of whole gale force near center. * * *"

The master of the Dalhart read these warnings in the newspaper. On the morning of September 8 he came down to the ship from his home in Brooklyn, but he left her at about 11 a. m. and did not return until the morning of September 9, after he had been told of the accident to the Havana. Before leaving the Dalhart the morning of September 8, he instructed the chief officer to let go the anchors if the wind was strong from the north or northeast but gave him no information about the approaching storm. He admitted on cross-examination that the ship was in an exposed position and that if the wind was strong from the north or northeast "it would blow her off her berth." He relied generally on the fact that the vessel had good lines and had been moored, from the time she was placed in her berth on August 28, with all her lines out. As a matter of fact, by the order of the chief officer, the anchors were dropped at 8 p. m. on September 8 after the storm had become severe, but naturally they would not prevent the Dalhart, if she broke from her moorings, from drifting or even from swinging the short distance of 20 feet necessary to make her collide with the Havana. The master left no direction with the chief officer that he should shift the vessel to a less exposed position, nor was any attempt made to shift her. At the height of the storm Perry, a seaman on board the Dalhart, testified that he heard a "snapping noise and could feel the ship moving. It was caused by the wires parting and * * * she was * * * drifting fast out and over across to the other pier, to the Kerr Line Pier. The anchors took hold and held her."

The trial court exonerated the Dalhart on the ground that she was necessarily moored in the exposed position where she lay, in order that the crane might be used in carrying out her repairs, and found that she was made fast in a manner "to withstand any weather that even with the storm warnings might be anticipated," and dismissed the libel accordingly.

■ It is manifest that the gale was an unusual one and the chief officer admitted at the trial that he would have taken steps to shift his vessel if he had known that there was going to be such an exceptional blow (Fol. 256.) But it is well known that cyclonic storms such as this at times reach great intensity and frequently increase in velocity as they come up the coast, and the warnings indicated the approach of one of serious proportions. The destructive force of such storms has manifested itself frequently enough as in the case of the storm at the end of August, 1924, in which The Arabic (C.C.A.) 50 F.(2d) 96, and The Homeric were caught off the Coast of Nantucket. We think that the storm warnings and the unpredictable intensity of cyclonic winds made it imprudent to leave a large vessel, which was moored close to another, exposed to the full force of a gale and with nothing to rely upon except the strength of her lines. There was plenty of time to shift her to a place in the lee of the dry dock either between the bow of the Havana and the bulkhead, or across the slip at the Kerr Line Pier. The lee of the dry dock would have shielded her from the wind and the Kerr Line Pier would have held her against a north or northeast gale. While a tug would have been necessary to move her, there was ample time within which to effect the transfer. It was far more important to insure the safety of other vessels than to keep the Dalhart in a place where immediate access to the crane would have been temporarily convenient.

■ The collision of the Dalhart with a moored vessel called for an explanation and put upon her the burden of showing that the exercise of reasonable nautical skill would not have prevented the accident. In view of the storm warnings and the intensity which is known frequently to accompany such storms as the warnings foretold, we think the respondent did not sustain the burden and show such care as the situation demanded.

The decree is reversed with costs, with directions to award an interlocutory decree to the libelant.