**CORYELL et al. v. PILKINGTON et al.**
No. 122.

District Court, S. D. Florida, Miami Division.

June 5, 1941.

Batchelor & Dyer, of Miami, Fla. (Bigham, Englar, Jones & Houston and Leonard J. Matteson, all of New York City, on the brief), for libelants.

R. C. Alley, of West Palm Beach, Fla., and Loftin, Calkins, Anderson & Scott, of Miami, Fla. (Burlingham, Veeder, Clark & Hupper and Eugene Underwood, all of New York City, on the brief), for respondents.

HOLLAND, District Judge.

Findings of Fact.

1. On June 24, 1935, an explosion and fire occurred on the houseboat Seminole, then lying in dead storage in the yacht storage basin and under the shed of respondent Pilkington at Fort Lauderdale, Florida. The fire was communicated to other vessels similarly situated, some of which were consumed, and some of which were damaged by the fire which likewise destroyed Pilkington's shed.

2. Prior to February, 1915, the Seminole had been owned by H. C. Phipps, a brother of respondent Phipps. In February, 1915, respondent Phipps bought from his brother a one-half interest in the Seminole. Prior to 1922 she was propelled by steam, but in that year her steam plant was removed and gasoline engines and their necessary appurtenances were installed. In 1927-1928 she was largely rebuilt at the Merrill-Stevens yard at Miami, many of her bottom and side plates being renewed, her electric wiring placed in conduit or wire mold at a total cost of about thirty-seven thousand ($37,000) dollars.

3. In late 1928 or early 1929 H. C. Phipps and the respondent, J. S. Phipps, each sold his one-half interest in the Seminole to the Seminole Boat Company, a Delaware corporation, which had been formed for the purpose of taking title to the Seminole and operating her under charter for hire. H. C. Phipps and re-

spondent Phipps each received one-half of the outstanding stock of the Seminole Boat Company in payment for his half interest in the vessel. The Seminole Boat Company promptly made a contract with William P. Baker, an experienced master of charter boats, well-known in the charter business, to operate the Seminole under charter for hire and in 1929 and 1930 she was so chartered on several occasions. Thereafter, while she was always available in the charter market, she was too big and too expensive to operate during the depression years, and no charterer was actually found for her after 1930.

4. From the beginning and down to and including the time of the fire the directors and officers of the corporation were Paul Scott, R. C. Alley and Roy H. Hawkins, who were, respectively, president, vice-president and secretary-treasurer. These men, as officers of the corporation, assisted by James F. Riley, and advised by Captain Baker and other boat captains, operated, controlled, maintained, and managed the vessel from the time of her purchase by the corporation down to and including the time of the fire.

5. In February, 1935, Hawkins, upon his own initiative, decided to remove the Seminole from dead storage at Pilkington's basin where she had been most of the time since 1930, and to bring her to Miami, put her in commission and offer her for charter or for sale. No charterer could be found, and the only offer to purchase was for an amount considered too small by at least one of the stockholders, respondent Phipps. The other stockholder, H. C. Phipps, on March 23, 1935, sold his stock in the corporation, one-half the outstanding stock, to Mrs. Amy Guest, his and respondent Phipp's sister. From that time on down to and including the time of the fire, the stock of the Seminole Boat Company was owned one-half by Mrs. Guest and one-half by respondent Phipps. No change in the operation, control, maintenance or management of the vessel occurred, nor in the official personnel of the corporation.

6. In April, 1935, when the charter season was over and no charterer had been found, the two stockholders, Mrs. Guest and respondent Phipps, and members of their family and friends went on a fishing trip in the Seminole to the Florida Keys. The crew was hired by Hawkins, except for the engineer and one sailor who were procured by Riley. On this occasion the operating expenses of the Seminole were voluntarily assumed and paid by respondent Phipps, but the expenses of the maintenance of the vessel on this occasion, and at all times following the sale to the corporation, were borne by the Seminole Boat Company, its deficits being made good in equal shares by the stockholders.

7. The cruise ended at Lower Matecumbe where respondent Phipps, Mrs. Guest, and the entire party left the vessel. Hawkins instructed the master to take the vessel to Miami and thence to respondent Pilkington's for storage. She arrived and was left at Pilkington's pier outside his shed on April 15, 1935, having been prepared for lay up there by her crew upon the instructions of Hawkins and without any instructions from respondent Phipps, who was not present and took no part in such preparation.

8. On June 24, 1935, Riley arranged for R. C. Abel, who was captain of Phipps' fishing boat "Clip", and sometimes of his boat "Iolanthe" to proceed to the Seminole on behalf of Seminole Boat Company, and there to pay to Pilkington a small balance due from the Seminole Boat Company to Pilkington on account of storage charges, to inspect the Seminole, and to bring back certain property belonging to the Seminole Boat Company. Abel was accompanied by John Thomas, with whom a contract had been made to make a piece of rope work for a vessel owned by respondent Phipps, Thomas to use a similar piece of rope work on the Seminole as his pattern. He and Thomas proceeded to Pilkington's basin where Abel obtained from Pilkington the keys to the Seminole, after which he and Thomas boarded the Seminole. After Thomas had finished his inspection of the rope work which was to serve as his pattern, Abel and Thomas gained access to the interior of the vessel by means of the keys given to Abel by Pilkington, and, after inspecting the spaces abaft the engine room, proceeded to the starboard engine room window between the engine room and the fore and aft alleyway. There Abel entered the engine room and proceeded directly aft to the switchboard, Thomas remaining in the alleyway at the window.

9. Abel lit a match to obtain light so that he might see the labels on the switches,

He manipulated three to five switches, at or near one of which a spark occurred. Following all of this the explosion occurred, which was followed by the fire and general conflagration.

10. A day or two after the fire, a diver found the four gasoline tank valves wide open, and the two valves on the gasoline drain line open one-third of a turn.

11. The contract pursuant to which the Seminole was left with and received by respondent Pilkington, was neither in writing nor oral, but implied, and the only parties to it were respondent Pilkington on the one hand and the Seminole Boat Company on the other. It contained no warranty or representation as to the condition of the Seminole, and Pilkington did not rely upon any warranty or representation, but rather relied upon his own familiarity with the vessel over a period of seven (7) years, when she had been stored with him on other occasions, both by her present and former owners, and his frequent inspections of her.

12. The Seminole Boat Company was incorporated in good faith for the bona fide purpose of taking title to the Seminole, and operating her in the charter business, and long prior to June 24, 1935. While it made no profits and no charters after 1930, it continued in existence as a bona fide corporation, and there is no fraud or other reason to disregard the corporate entity, pierce the corporate veil, or regard it as an agent of either of its stockholders. It stands as a nonconductor between the libelants and Pilkington on the one hand, and the stockholders on the other.

### Discussion.

This case has been very thoroughly presented, in the introduction of evidence, in the interrogation of witnesses, and by careful, painstaking, and exhaustive arguments, impelling me to discuss somewhat in detail the questions of liability, proximate cause, and limitation of liability, and not content myself with the conclusion reached that respondent Phipps is not liable. The organization of the corporation, Seminole Boat Company, was a natural, normal development of ownership of a pleasure yacht, free from any fraud or ulterior motive in the inception of its chartering and creation. Likewise, it was free of any of the other elements, treated in the reported and cited cases incident to the presence of bad faith, which apply the doctrine of piercing the corporate veil. Furthermore, the character of the negligence which this record discloses is the failure to do or perform a duty, or nonfeasance. Such failure of duty does not give rise to an application of the alter ego or agency doctrine. I can well conceive of cases where a positive wrong, an act of positive negligence, may lead to individual liability of a stockholder in a corporately owned offending vessel, but this is not such a case.

The presence of gasoline fumes in the engine room, I find was the proximate cause of the damage done to the vessels of libelants. Abel was the instrumentality which brought this defective condition into an active element proximately causing the damage, but Abel's acts were not the proximate cause. It is immaterial whether Abel was the agent of Phipps or Seminole Boat Company; his acts or conduct were not the proximate cause of the damage suffered.

The Seminole Boat Company was responsible for the proximate cause. It was not negligence to have converted a steam yacht into a gasoline propelled vessel, and from the evidence it is clear there was no negligence in the original installation of the tanks which were used on the Seminole for gasoline storage. But with the passage of time some part of the machinery or equipment did leak and the great possibility of damage attendant upon the use of gasoline, brings into play the principle that negligence may be based upon circumstantial evidence alone. The respondent argues that there must have been some third person agency intervening which brought about the means whereby gasoline escaped with attendant fumes. There is no evidence of this, and we get into the realm of conjecture. Just when the defective condition of the tanks made them leaky is in doubt. Expert testimony on this is an unsatisfactory character of evidence. I am satisfied, and find, that there were gasoline fumes present in the engine room, and that their ignition into combustion and fire caused the damage. For this the Seminole Boat Company was liable. Whether the Seminole Boat Company could limit liability is not necessary to decide. That is not in the case.

As to Pilkington, he owed certain duties to libelants as owners storing their

vessels with him as a warehouseman, and with his duty of inspection he may be criticized for not having detected and avoided the gaseous fumes on the Seminole, but I do not find that his dereliction in that regard was sufficient on which to base liability.

█ As to respondent Phipps, he is not chargeable with the negligence, the proximate cause of the damage. For two reasons is this so. Firstly, because the negligence was that of the Seminole Boat Company and not of Phipps; and, secondly, he was without privity or knowledge, even though he should be considered as owner. The character of negligence shown by this record was such that Phipps, as an individual, would not be precluded from asserting as a limitation of liability under the statute. This limitation of liability is provided for by 46 U.S.C.A. § 183, which is derived from the Act of March 3, 1851, Section 3 of Ch. 43, 9 Stat. 635. Libelants insist that the six months' limitation enacted June 5, 1936, is applicable with which contention I do not agree. The said six months' limitation is a part of a substituted Section 4285 of the Revised Statutes, 46 U.S.C.A. § 185, and not Section 4283 Revised Statutes, which is 46 U.S.C.A. § 183. Section 185 deals with voluntary action taken by an owner depositing the value of his interest in the vessel in Court, while a limitation defense pleaded in an answer is provided for in said Section 183.

### Conclusions of Law.

1. There was no negligence on the part of respondent Phipps or any person for whose acts or omissions he is responsible.

2. Seminole Boat Company, a Delaware corporation, was at all pertinent times a bona fide corporation, a valid creature of the law, not to be regarded as sham or fiction, or Phipps' agent, but as a legal nonconductor between Phipps on the one hand and libelants and Pilkington on the other, because there was no fraud or other improper conduct or purpose in the creation or continued existence of the corporation.

3. The Seminole was owned, operated, controlled and maintained by Seminole Boat Company, not respondent Phipps, and respondent Phipps is not liable for any acts or omissions of the Seminole Boat Company, or any persons who acted on its behalf.

4. Respondent Phipps was without privity or knowledge of the events that led up to and brought about the explosion and fire, and if corporate liability be disregarded, which in my opinion should not be, Phipps would be entitled to limit his liability to the value of his interest in the wreck of the Seminole after the fire under the Limitation of Liability statutes.

5. Respondent Phipps is not liable to the libelants, or to Pilkington.

6. Respondent Pilkington is not liable to the libelants.

Final judgment should be submitted in accordance herewith, on notice to all counsel.