**THE CHICKIE et al.**

Nos. 8434, 8473.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 7, 1944.

Decided Feb. 8, 1944.

See also, D.C., 39 F.Supp. 200, D.C., 54 F.Supp. 17, D.C., 54 F.Supp. 19.

Lucian Y. Ray, of Cleveland, Ohio (John H. Sorg, of Pittsburgh, Pa., and Lee C. Hinslea, of Cleveland, Ohio, on the brief), for American Barge Line Co., Inc.

David M. Harrison and Harold E. Mc-Camey, both of Pittsburgh, Pa. (Maurice Louik, of Pittsburgh, Pa., on the brief), for claimants of steamboat Chickie.

John R. Bredin, of Pittsburgh, Pa. (Dalzell, McFall & Pringle, of Pittsburgh, Pa., on the brief), for River Sand Co.

Before BIGGS, JONES, and GOOD-RICH, Circuit Judges.

GOODRICH, Circuit Judge.

This suit in admiralty was brought by The River Sand Company as libelant to recover for damage sustained by its sand digger, the "Admiral", when the "Admiral" was struck by one or more drifting barges belonging to the American Barge Line Company, Inc.,[1] on February 2, 1939. The "Admiral" was, at the time, anchored in the Ohio River near Follansbee, West Virginia. The respondents are the steamboat "Chickie" and the American. A question concerning the personal liability of the owners of the "Chickie" is also in the case as presented to us and will be considered in due course.

The "Chickie" owned by a partnership called the "Lyons River Transportation Company" was, at the time of the facts here recited, under a time-hourly charter to American but was manned, victualled and supplied by her owners. The "Hider", another river steamboat was under a bare-boat charter to American and was manned, victualled and supplied by the latter.

On February 1, 1939, the master of the "Chickie" was given written instructions to

[1] Hereafter referred to as "American".

pick up eleven of American's barges and to proceed down the Ohio River to meet the "Hider" coming up the river with another tow. Thereupon the "Chickie" was to exchange tows with the "Hider" and return to Pittsburgh. While proceeding down the Ohio River one of the barges in the "Chickie" tow struck a pier of the Steubenville Highway bridge. The tow broke loose and was scattered. The "Chickie" and a steamboat which came to her assistance collected the scattered barges and the tow was moored to the shore at a point near Follansbee, West Virgina. The barges were lashed together and a headline made fast to a large tree on shore. Up to this point no facts have occurred which are made the basis for a claim for recovery in this litigation.

Upon the evening of February 1, American's general agent came to the place where the barges were moored. He instructed the master of the "Chickie" that if satisfied in the morning that everything was all right, the latter was to leave the fleet, deliver an empty barge to Yorkville, a few miles away, and then continue along downstream until he met the "Hider" and to assist the "Hider" upstream. These instructions were followed. The "Chickie" delivered the empty barge, met the "Hider" and the two vessels, with the "Hider's" tow, proceeded upstream. While thus proceeding the master of the "Hider" and several of her crew boarded the "Chickie" with ratchets, wires, lashings and a line. About six miles below the moored barges, the "Chickie" left the "Hider". The "Hider" proceeded alone upstream and the "Chickie" with the Captain and part of the "Hider's" crew on board proceeded to the moored barges of the "Chickie" tow.

From now on the legally operative events began to take place and the testimony relating to them is in sharp conflict. This much is undisputed. When the "Chickie" arrived at the moored barges it was met by Captain Lyons, a member of the partnership which owned the "Chickie". After a conference among Captain Lyons and the masters of the "Chickie" and the "Hider" was held, four barges were cut out from the tow and the "Chickie" started with them for a destination about two miles down-

stream known as the "Coal Tipple". The remaining barges were left untended. During the absence of the "Chickie" they broke loose, drifted downstream and one or more of them collided with the "Admiral" causing the damage complained of.[2] When the loose barges were picked up there was attached to the line from one the trunk of a tree to which the line from the barge had been tied.

Interwoven with these uncontradicted facts are disputes as to what actually took place and the legal conclusions to be drawn therefrom. On behalf of the "Chickie" it is argued that there was no negligence on the part of her owner, master or crew. Upon this point we reject the argument and agree with the trial judge. There was testimony to the effect that when the "Chickie" came back from meeting the "Hider" it was met at the moored barges by Captain Lyons, one of the owners. Captain Lyons is alleged to have said to Captain Wright of the "Hider", in the presence of Captain Schlegel of the "Chickie", that he was glad to see them come for "This tree looks like it was going to pull loose;" referring to the tree to which the barges were moored. While the making of the statement is denied the trial judge found it to have been made and we agree. At the time of the events being described the river was falling. With the warning that this tree was in danger of pulling loose and with the falling river which, obviously, would increase the pull on the tree, the "Chickie" departed, leaving no one in charge of the moored barges. There was evidence that it was customary to leave a man in charge when barges were left moored to the shore. Without that, however, there seems to us enough to justify a conclusion that the conduct was, under the circumstances, negligent both as to the barges and their contents and other river traffic. The decisions establish the rule that when a moored vessel breaks loose and drifts, thereby colliding with another vessel, those in charge of the offending boat are required to explain that the accident did not happen through their fault in order to be free of liability. The Louisiant, 1865, 3 Wall. 164, 18 L.Ed. 85; The Waterloo and The Glenalvon, 3 Cir., 100 F.

<hr>

pressed, however. In any event we think the facts support the finding by the trial judge that one of these loose barges struck the "Admiral" and caused the damage complained of.

332, 335, certiorari denied, 1900, 178 U.S. 613, 20 S.Ct. 1030, 44 L.Ed. 1216; The Havana, 2 Cir., 1937, 89 F.2d 23; The President Madison, 9 Cir., 1937, 91 F.2d 835. We think the conclusion here is that the collision between the barge and the "Admiral" was negligently caused. The "Chickie" is, therefore, liable. The "Chickie", however, was sold in the course of the proceedings herein. The sale did not bring enough to pay for the marshal's charges for custody and the "Chickie" thus disappears from the picture.

The trial court, however, gave a decree in personam against American. American says that whatever may have been the negligent conduct of those in charge of the "Chickie", it is not responsible therefor. All American did, it is argued, was to hire the "Chickie's" services at so much per hour, give written directions as to the trips "Chickie" was to take on American's behalf and pay the owners the hourly rate for such work. It is to be noted in this connection that the general agent of American who was on the job after the Steubenville Bridge accident came to the place where the barges were moored and gave directions to the "Chickie's" master which involved a change from the original orders. The heart of the controversy, however, lies in the dispute as to what took place following the boarding of the "Chickie" by the "Hider's" master and mate, accompanied by some of the crew together with some of their ratchets, lashings, etc. That the two masters and Captain Lyons talked together at the scene of the moored barges is clear. The libelant claims that the evidence shows that Captain Wright, of the "Hider" took charge and since Captain Wright was undoubtedly an employee of American the conduct of the enterprise from then on was American's. Responsibility for negligence would follow, of course. American asserts that Captain Wright did no more than hold a friendly conversation with the "Chickie's" master, that the latter did not abrogate his functions as master of his own ship and that the responsibility of American did not begin until the exchange of tows of the two vessels was actually accomplished.

We think that we need not go so far as to find that Captain Schlegel of the "Chickie" completely stepped aside and left Captain Wright of the "Hider" in complete control of the enterprise. It is enough that Captain Wright, acting for American, became a joint participant and this we think he did. It was his duty to pick up this tow. He came to where it was following an accident. One barge had already sunk. The rest were drawn up along the shore at a place where he thought it was advisable to reorganize the tow. He selected the four barges which were to be cut out and taken to the "Coal Tipple". He was getting into the shape he wanted the barges he was to take as his tow downstream. We do not know who actually gave the order that all hands should accompany the "Chickie" and the four barges cut out from the remainder of the tow. Both the "Chickie" and the "Hider" had men there on the spot. We think the conduct of the affair at that stage was at least a joint transaction and each is liable for the consequences of negligence which took place in the conduct of it. The conclusion is that American was properly held liable by the trial judge.

Part of the argument before us pertained to the question of limitation of liability of the owners of the "Chickie". In the lower court, the owners sought limitation of liability under the statute[3] in two ways. (1) Within six months of the filing of the libel, they filed a "Petition for Limitation of Liability and Exoneration From Liability." Despite certain procedural irregularities,[4] it is clear that this petition sought limitation of liability by the separate proceeding at the suit of the owners as authorized by § 185 of the statute. (2) Subsequently, more than six months after the libel was filed, the owners filed an answer to the libel in which they, inter alia, referred to their petition previously filed, re-averred most of the statements alleged therein, and asked for a decree of limitation of liability. At the same time they filed a motion asking that their answer be filed nunc pro tunc as of the date of the petition. This the court granted. In an opinion filed July 10, 1942, 54 F.Supp. 19,

---

[3] 46 U.S.C.A. §§ 183, 185.

[4] The caption on the backing of the petition was the same as that appearing on the libel and bore the same number. The caption on the first sheet of the petition, however, was entitled "In the Matter of Petition for Limitation of Liability * * * [etc.]". The petition contained the required averments and prayers of a petition in a separate proceeding by a ship owner to limit liability pursuant to § 185 of the statute. See 3 Benedict on Admiralty (6th Ed.1940) pp. 471 et seq.

the court held that the prayers of the petition could not be granted since there had been a failure to deposit the res, a bond, or a fund, or transfer to a trustee, with the court. However, it was held that the claim for limitation of liability had been properly raised in the answer. In its decree the court granted one partner, Wagner, individually, limitation of liability but denied limitation to Lyons, the other partner, and the partnership. A decree was entered accordingly, 54 F.Supp. 21 and all the parties complain.

The owners contend that the libelant's suit was, as to them, in rem, not in personam and that consequently neither they nor the partnership could incur a personal judgment. American's answer to this is that upon submission of the petition for limitation of liability the jurisdiction of the court attached both in rem and in personam and it cites Hartford Accident & Indemnity Company v. Southern Pacific Company, 1927, 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612. The rebuttal is that the petition was a nullity.

It is clear that the libelant's suit was in rem only, in so far as the "Chickie" and her owners were concerned. However, it is equally clear that a ship owner may invoke the statute either by petition in a separate proceeding or by answer, although the libelant's action is solely in rem. The City of Norwich, 1886, 118 U.S. 468, 502, 6 S.Ct. 1150, 30 L.Ed. 134; see also Just v. Chambers, 1941, 312 U.S. 383, 386, 668, 61 S.Ct. 687, 85 L.Ed. 903. In the Hartford case, supra, it was held that if an owner brings a separate proceeding for limitation of liability and loses on the issue of right to limitation, the jurisdiction of the court attaches both in rem and in personam. Consequently, the court may furnish complete relief to all claimants brought into the proceeding, by rendering personam judgments as well as distributing the res. Here, however, the proceeding on the petition was never sufficiently completed for the jurisdiction of the court to

attach to this extent. All that the owners did was to file their petition. There was no transfer of a res to a trustee; no monition ever issued; the required fee for filing the petition was not even paid. The petition had no legally operative effect; we may dismiss it from further consideration.

There remains the question, however, of the consequence of the plea of limitation of liability set up in the answer. We start with an action which, as to the "Chickie" is purely one in rem. Then the owners set up, in their answer, a claim for limited liability, which was, in part, denied. Thereafter the court decreed in personam liability. Was there power in the court to impose such liability?

At the outset we are met with the contention that the plea by way of answer came too late. The basis for this is the six months limitation period inserted in § 185 by the 1936 amendment thereto. As amended § 185 provides that "The vessel owner, within six months after a claimant shall have given to or filed with such owner written notice of claim, may petition * * * for limitation of liability within the provisions of this chapter * * *." Does this limitation period govern a plea for limitation by way of answer?[5] If it does, then our question is easily answered, for the answer was ineffective because not timely, and the attempt to petition for liability having proved abortive, the question would not have been presented to the trial court. We think the point made in the answer was made in time, however, and will state why before passing to the question of its effect on the legal relations of the parties.

The statute providing for limitation of liability was first enacted in 1851, 9 Stat. 635. Section 3 thereof provided that the liability of a ship owner, for certain types of losses "shall in no case exceed the amount or value of the interest of such owner or owners * * * in such ship or vessel, and her freight then pending." Section 4 provided that if losses were in-

---

[5] There is a conflict of opinion upon this point among the District Courts. In The Irving, D.C.S.D.N.Y.1940, 33 F.Supp. 59, affirmed, sub nomine United States Gypsum Co. v. Conners Marine Co., 2 Cir., 1941, 119 F.2d 689 (without decision on this point), The Joseph O'Donnell, D.C.E. D.N.Y.1940, 37 F.Supp. 120, the limitation was held to be applicable to a plea in the answer. Contra: Carpenter v. Mary R. Mullins, Inc., D.C.D.Mass.1940, 33 F.

Supp. 10; Coryell v. Pilkington, D.C. S.D.Fla.1941, 39 F.Supp. 142, affirmed, sub nomine Coryell v. Phipps, 5 Cir., 1942, 128 F.2d 702, affirmed, 1943, 317 U.S. 406, 63 S.Ct. 291 (issue not involved in appellate courts' opinions); Cantey v. McLain Line, Inc., D.C.S.D.N.Y.1941, 40 F.Supp. 887. Accord, 3 Benedict on Admiralty § 508. There is no appellate decision on the point.

curred by several "freighters or owners" and the value of the ship or vessel and her freight was not enough to compensate them all, there was to be proportionate compensation. Further, it was provided, that the owner (of the vessel causing the loss) "may take the appropriate proceedings in any court, for the purpose of apportioning the sum for which the owner * * * may be liable. * * *" In Norwich Company v. Wright, 1871, 13 Wall. 104, 20 L.Ed. 585, Mr. Justice Bradley had occasion to consider this statute and to suggest that a ship owner could avail himself of it by petitioning a competent court for limitation of liability under § 4. Subsequently the Supreme Court promulgated rules of procedure for a proceeding by the owner by petition to limit his liability.[6] Then, the Congress itself specified that the proceeding at the suit of the owner was to be by petition. In another opinion discussing the statute, Mr. Justice Bradley pointed out that the Admiralty Rules of the Supreme Court were not intended to restrict ship owners in claiming the benefit of the limitation of liability statute, but to aid them and held that where all the parties injured are represented as libelants or intervenors in an action, the defense of limited liability could be made by answer and was adequate to give the ship owners all the protection they needed. The Scotland, 1881, 105 U.S. 24, 26 L.Ed. 1001.

These two methods of claiming limitation of liability have been available to ship owners ever since. Until 1936 there was no time limit in the statute. The 1936 Amendments did not abolish the right of a ship owner to plead limitation in his answer; both methods are still available thereunder. What may be termed the substantive section of the statute, § 3 of the 1851 Act, which gave the ship owner the defense of limitation of liability,[7] is still in force, without any express time limitation in it. See § 183(a). The six months limitation was inserted only in what may be called the procedural section, § 185.

We think it is abundantly clear, in view of the historical development of the statute, that the time limitation put in § 185 by the 1936 Amendment and made expressly applicable to a proceeding by petition at the suit of the owner, is not to be read into § 183(a) by implication, particularly in view of the fact that both sections were simultaneously amended in 1936. To read the time limitation into § 183(a) would militate against the well settled rule that the courts are to construe the statute liberally. It would tend, without an express declaration by Congress, to increase the economic burden of ship owners, thus placing them at the competitive disadvantage which the statute sought to avoid. See Coryell v. Phipps, 1943, 317 U.S. 406, 411, 63 S.Ct. 291; Consumers Import Co. v. Kabushiki Kaisha Kawasaki Zosenjo, 1943, 320 U.S. 249, 64 S.Ct. 15. It would also require that once the sole injured party gave notice of claim, but delayed filing suit, the ship owner must of necessity bring a proceeding within six months to save his rights, since a libel may not be filed against him by the injured party for more than six months after notice. We conclude therefore that the owners' plea of limited liability contained in their answer to the libel was timely.

Now we come to the last question, arising upon this set of facts. An action in rem is brought against a vessel.[8] The libel was against "Steamboat 'Chickie', its engines, boilers, etc., against all persons claiming any interest therein; * * *." It sought a decree of "payment to libelant from said vessel of the amount of its claim" and prayed that the vessel "be sold to pay the same". No personal decree was sought against the owners or operators of the vessel. Nevertheless the owners came in with an answer seeking to limit a type of relief not asked for by the libelant in the first place. This the court denied in general but granted in part.

It is argued that upon the denial of limitation of liability the respondents are liable in personam, and the Hartford case, supra, is heavily relied upon. But in that case the owner had taken the laboring oar, and sought to limit liability by the proceedings appropriate for that purpose. He had come into court asking for relief advantageous to himself. When such a proceeding is employed a res must be deposited with the court; the court issues a monition, against all persons claiming damages, citing them to appear and file their claims; the court may enjoin all suits against the owner on

---

[6] For the present rules see Admiralty Rules of Practice promulgated by the Supreme Court, Rules 51–55, 28 U.S.C.A. following section 723.

[7] See 3 Benedict on Admiralty, supra.

[8] As already stated the suit was in personam against American Barge Line Company.

such claims. In the Hartford case the Court deemed this broad sweep of a proceeding by petition of primary importance in arriving at its conclusion. It pointed out that a ship owner could delay and prevent his creditors from proceeding against him in any other forum; that other claimants could be brought into a forum of the owner's choice against their will; that meanwhile the ship owner might become insolvent. If, after causing all this, a ship owner could not sustain his claim to limitation of liability, dismissal of the proceeding would be inequitable to the claimants. On equitable principles, the court should settle the many cornered controversy before it, by giving the claimants full relief.

■ None of these considerations is pertinent here. The owners started no proceeding in this forum; it was the libelant who did that, and the relief it asked for was the condemnation and sale of the vessel. That it was entitled to and that it got. It should not have had more, unless the answer of the claimants, owners of the "Chickie", by asking for protection against a claim that was not made, changed the action in rem to one both in rem and in personam. We can grant that the effect of the answer was to constitute a "general appearance" on the part of those on whose behalf it was filed. But can it be, to borrow language,[9] "a general appearance in a proceeding that did not exist and was not indicated."? We think not. Whatever the libelant could have asked for against the owners of the "Chickie", all he did ask for was condemnation and sale of the vessel. Nothing else was prayed for originally; nothing further was sought by amendment. The appearance by the owners was "co-extensive with the nature of the action."[10] but did not serve as a foundation for a claim which the libelant never made.

■ The distinction is no technical rule of pleading but goes to fundamentals. The action in rem directs a plaintiff's claim to a thing. True, the plaintiff's judgment, if he is successful, affects persons, but only so far as concerns their interest in the thing, which is personified as a defendant in the litigation. If the court's jurisdiction is founded solely on the presence of the thing no personal judgment, even for costs, can be imposed on the owner. Restatement, Conflict of Laws (1934) § 106, comment a; Restatement, Judgments (1942) § 34, comment g. A suit for a personal judgment may arise out of dealing with a thing, but the plaintiff's claim is against the defendant generally and all the latter's assets which are subject to execution are liable to seizure to satisfy a judgment in the plaintiff's favor. A suit begun by a plaintiff as one in rem against a thing does not change its nature by what other parties to the litigation may say. His recovery is still limited by his claim.

The conclusion as to this case is as follows: a. The decree against American was correct and is affirmed. b. The same is true as to the decree against the vessel "Chickie". c. As to Beatrice Lyons, Administratrix of the Estate of Andrew C. Lyons, deceased, and J. Huber Wagner, either individually or as traders under the firm name of Lyons River Transportation Company, no claim was made by libelant, and no decree should have been entered against them. Nor did their answer asking limitation of liability present any justiciable issue in the case.

■ Our rule No. 26 providing for an appendix instead of the printing of the entire record has not worked out happily in this case. No party has given us the pleadings, important as they are, on the limited liability question. We have several unconnected excerpts from testimony and have had to turn to the transcript to get a consecutive account of the litigation in the court below. We think under the circumstances that neither party is entitled to costs in this Court as against the other.

The decree is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

---

[9] Barrett, J., in The City of Atlanta, D.C.S.D.Ga.1927, 17 F.2d 311, 314.

[10] From the language of Brown, J., in The Monte A., D.C.S.D.N.Y.1882, 12 F. 331, relevant to the discussion here though not precisely in point.