**Oscar B. LADNER and Liberty Mutual Insurance Company, Plaintiffs,**

v.

**BENDER WELDING AND MACHINE COMPANY, Inc.; The EL TORO, her engines and boilers, etc., Defendants.**

**J. C. McCAA, Jr. and Travelers Insurance Company, Plaintiffs,**

v.

**BENDER WELDING AND MACHINE COMPANY, Inc.; The EL TORO, her engines and boilers, etc., Defendants.**

**Civ. A. Nos. 3794, 3798.**

United States District Court, S. D. Mississippi, S. D.

April 2, 1971.

Norman Breland, Boyce Holleman, Charles Galloway, Gulfport, Miss., for Oscar B. Ladner and Liberty Mutual.

Norman Breland, Boyce Holleman, Gulfport, Miss., for J. C. McCaa, Jr., and Travelers Ins. Co.

Stanford Morse, Gulfport, Miss., Alex F. Lankford, III, A. Clay Rankin, III, Mobile, Ala., for defendants.

WILLIAM HAROLD COX, District Judge.

These consolidated cases result from damage done two vessels on Gulfport Lake on the Mississippi Gulf Coast by Hurricane Camille on Sunday night, August 17, 1969. Ladner owned a pleasure yacht known as the Off Key and had an insurance policy on the craft with Liberty Mutual Insurance Company as his insurer covering such insurance risk for which he was paid $60,000 by said insurer. The insurer claims for its loss on such risk $41,019.62, plus interest. Ladner claims an additional loss of $21,150, plus interest and punitive damages. McCaa owned the Miss Behave which he had insured with the Travelers Insurance Company against such insurance risk and for which he was paid $28,126 by said insurer. Travelers Insurance Company claims the sum of $28,126, plus

interest. McCaa claims a further substantial sum plus punitive damages. Common law and admiralty jurisdiction is invoked here.

Hurricane Camille struck the Mississippi Gulf Coast area with unprecedented force and fury of wind and tidal wave which reached the height of its rage between 11:00 P.M. and 1:00 A.M. on the night of August 17 and the morning of August 18, 1969. The undisputed proof in this case showed that the winds in this hurricane attained a velocity and force in excess of 200 miles per hour. The barometer on this occasion reached an unprecedented low of 26.61 inches. The height of the tides on this occasion is estimated to recur once in every 170 years. The intensity of the winds reaches such velocity only six times in every 1,000 years. One-third of the Bay St. Louis bridge at the western end of the Mississippi Gulf Coast was destroyed. One-half of the Biloxi-Ocean Springs bridge at the eastern end of the Mississippi Gulf Coast was destroyed. Camille wreaked havoc in Mississippi alone estimated at $950,000,000, with 250 dead and 45,000 homes destroyed or damaged. The undisputed and incontrovertible evidence and testimony in this case showed that no such devastating force of nature had ever visited the mainland of the United States of America in its recorded history.

The Off Key was a pleasure yacht fifty feet long, built in 1963, and within recent years purchased and on this occasion owned by Oscar Ladner. The Miss Behave was a pleasure yacht sixty-four feet long, built in 1924, and purchased in recent years by J. C. McCaa for $30,000. The owners of both of these yachts contend that they were injured during this hurricane by reason of the negligence of Bender Welding and Machine Company, Inc. as the owner of the yacht El Toro in its management and handling immediately prior to and during the hurricane. The El Toro is a craft 105 feet long with a twenty-four foot beam and a steel hull. This elaborately constructed and equipped yacht cost Bender to construct it, the sum of $600,000. It was completed about August 17, 1967.

The plaintiffs in these consolidated cases contend that the defendant on this occasion should have sought shelter from Camille sooner than it did and should have anchored such craft in a safer and better manner so as to avoid dragging its anchor and damaging their crafts. The evidence shows that the plaintiffs anchored in this lake early during the day preceding this catastrophic hurricane in response to repeated warnings from the weather bureau during the day, but that the defendant did not leave the marina at the Broadwater Beach until late in the morning when the hurricane struck in the middle of the following night. The El Toro anchored in the lake during the middle of the afternoon on Sunday, August 17. It employed one conventional size and weight of anchor for such purpose. It had a larger anchor on deck which it did not use. The plaintiffs' yachts both used two anchors. During and throughout this storm at the height of its fury, the El Toro dragged anchor and on many occasions appeared in frightening proximity to the smaller yachts of the plaintiffs. The Off Key contends that the El Toro came astride its anchor lines and when such crossing was completed, the Off Key snapped back into position with such force as to cut its anchor lines and set the Off Key adrift in the wind on this lake. That contention is not proved by the greater weight of the more convincing evidence. Neither the anchor nor the anchor rope from the Off Key were ever found, but the fragment of the line still on deck conclusively showed that it was chafed and cut by the sharp corners of the bit on deck to which it was attached. Ladner and his companions stayed on board his yacht throughout the storm and did an excellent job in maneuvering it as much as possible to avoid complete destruction. It came to rest on the north shore of the lake on dry land in a very badly damaged condition. It was never touched in any manner, directly or indi-

rectly, by the El Toro. The harrowing experience of those on board such a small craft during such a violent storm understandably left them possessed of vivid imaginations as to details of incidents occurring during such a time. Ladner settled his insurance claim with his insurer for $60,000 as the agreed total value of his loss on such occasion. He has not shown by the evidence in this case that his yacht was damaged as a proximate result of any negligence of the defendant in this case under these circumstances.

■ The Miss Behave contends that it was struck in the rear by the El Toro during this storm, and was set adrift by the careless handling of the El Toro. A careful inspection of the hull of the El Toro and the hull of the Miss Behave by skilled and experienced craftsmen did not reveal any sign of any contact between these two vessels. Indeed, the proof showed that any contact between the steel hull of the El Toro with the rear end of the Miss Behave would have put the Miss Behave out of operation immediately. The evidence showed that the Miss Behave had out two anchors during the storm and that it was set adrift in the lake, and likewise came to rest on the north shore of the lake close to the Off Key and in a badly damaged condition. The anchor and approximately sixty feet of anchor line were identified as being the anchor and line of the Miss Behave which were lost during this storm. Significantly, this lake was approximately twenty feet deep which ordinarily would require an anchor line of 140 feet. This anchor line used by the Miss Behave was clearly too short, and its chafing at the point of anchorage on the vessel caused it to be cut and to set the vessel adrift in the storm. The long chain on the anchor of the El Toro was normally sufficient to have taken care of all motion of the vessel under ordinary and reasonable circumstances. The Mississippi Gulf Coast has grown accustomed to hurricanes, but it has never in history experienced anything like the intensity and ferocity of Hurricane Camille. The immediate preceding hurricane called Betsy had wind velocity up to seventy-five miles an hour, and did extensive damage to the Mississippi Gulf Coast, but it was nothing to compare with Camille. This storm was simply a freak act of nature which was completely unpredictable and of unheard of intensity. Even the course and direction of the hurricane and exactly where it would strike was very uncertain and unpredictable until a very few hours before it actually struck. It was expected to strike northeast of the Mississippi Gulf Coast, but during its latter hours it changed its direction and vented its fury and impact with all of its intensity upon the Mississippi Gulf Coast from Biloxi to Bay St. Louis, Mississippi. The plaintiffs (McCaa and Travelers) in this case have not shown this court by a preponderance of the evidence that the El Toro was guilty of any kind of negligence which proximately caused or contributed to its damage and injury. The Miss Behave, like so many other objects of its fury, was selected by Camille for extensive damages for which the El Toro was not responsible or liable.

■ It is extremely difficult in a case like this involving such an experience as riding out an unprecedented hurricane to find out exactly what happened for certain. Like in a motor vehicle accident at an intersection, the views of perfectly honest and sincere and conscientious people always vary extensively and present an almost irreconcilable puzzle for the trier of fact to piece together for a meaningful disposition of the case. It can be said in this case that the proof presents more than one plausible explanation for the sequence of events during this raging storm, but that is not sufficient to warrant a recovery by a plaintiff.[1] Hurricane Camille was a

---

1. Hanson K. Dreijer v. Girod Motor Company, Inc., 5 Cir., 294 F.2d 549, 556 holds: "Where the evidence of the party on whom rests the burden of proof is equally consistent with several different hypotheses no single one is proved. Mu-

hurricane of unprecedented intensity and consequent unpredictability. Nobody, including the experts in the weather bureau, knew just exactly where this hurricane would enter the mainland and what course it would pursue, and the velocity of its winds and accompanying tides. This defendant decided late in the morning on August 17, 1969 to move his vessel inland for shelter. It was a comparatively new vessel and had just returned from a trip to Mexico without any difficulty, or indication as to any trouble with its operation. As it backed out of the Broadwater Marina one of its hydraulic steering arms malfunctioned and failed, and made it extremely difficult to guide or maneuver the vessel. Nevertheless, it made its way out of Mississippi Sound and ultimately into Gulfport Lake late that afternoon, and this court can find no trace of any negligence on its part in arriving at said lake at such time under the circumstances. Apparently, its anchor would not hold the vessel against such winds, even when motor power was applied to the vessel, and it still pitched and tossed as did other craft in the area. But it is said that all craft other than a barge, the Off Key, the Miss Behave and El Toro were still anchored the next morning. That fact and circumstance of itself does not establish or indicate any negligence by the defendant. No amount of experience and good seamanship could have predicted this course of events, or could have devised a safer or better defense against it.[2] The captain of the El Toro was an experienced man in this field, and his two assistants were competent and sufficient to take care of all of the requirements of this vessel. The available and used equipment and tackle of the El Toro was adequate and sufficient for all of its needs and requirements under any reasonably foreseeable circumstance or condition at this time.

This accident happened in navigable waters which are inland from Mississippi Sound. This court has full jurisdiction of all of the parties to these consolidated cases and of its subject matter. The court is of the opinion and so finds that the El Toro exercised due and proper care in using the one anchor connected with a chain securely fastened to a bit or post on the deck of the vessel as a reasonable protection under all known circumstances and conditions against dragging its anchor. The El Toro did in fact drag its anchor, but made no physical contact with either the Off Key, or the Miss Behave; but it was shown by a preponderance of all of the evidence that as an inevitable and unavoidable result of an act of God, the plaintiffs (Ladner and Liberty Mutual, and McCaa and Travelers) in this case have suffered damages which human skill and precaution, and a proper display of nautical experience could not

tual *Life* Ins. Co. of New York v. Hess, 5 Cir., 1947, 161 F.2d 1, motion to retax denied 5 Cir., 1951, 191 F.2d 817; One 1941 Oldsmobile Sedan v. United States, 5 Cir., 1947, 161 F.2d 348. 'Where the facts proven show that there are several probable causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause or the other, plaintiff cannot have a recovery, since he has failed to prove that the negligence of the defendant caused the injury.' Ingersoll v. Liberty Bank of Buffalo, 1938, 278 N.Y. 1, 14 N.E.2d 828, note 4. The burden of proof requires that the party's evidence indicate the facts on which his recovery depends actually did occur, not merely that it is *probable* that they occurred. See 2 Harper and James, Law of Torts, § 20.2, pp. 1110–1120."

2. When it is established that it was the El Toro which broke loose from its anchorage and inflicted some damage upon the Off Key and the Miss Behave, if so established, then it must be remembered that Hurricane Camille developed winds of more than 200 miles per hour velocity and force. The activities of this hurricane were unprecedented in American history. The President Madison (9 CCA) 91 F.2d 835, 841 holds: "Good seamanship does not require foreknowledge of unprecedented events."

Cf: United Geophysical Co. v. Vela, (5 CA) 231 F.2d 816.

have prevented.[3]  Such damage was not inflicted by the defendant.  The plaintiffs in these two cases have not shown any damage or injury to have been inflicted upon them by the defendant, or the crew, or tackle of the El Toro on this occasion, and have not proved any actual or punitive damage for which the defendant and its vessel and crew were responsible or are liable.  Both complaints in their entirety are without merit and will be dismissed with prejudice at the cost of the plaintiffs.

A separate judgment to such effect, incorporating such findings and conclusions by reference thereto, may be presented for entry within five days after this date in accordance with the rules of this court.

---

3.  United States of America v. Steamship Joseph Lykes, et al, 5 Cir., 425 F.2d 991, 995 holds: "The moving vessel must show that her drifting was the result of an inevitable accident or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented.  The burden of proving inevitable accident or Act of God rests heavily upon the vessel asserting such defense."