719 So.2d 31 (1998)
BURKLOW & ASSOCIATES, INC. d/b/a Mel's Marina, Appellant,
v.
Reagan BELCHER, James Bosso, Steve Brown, et al, Appellees.
No. 97-1739.
District Court of Appeal of Florida, First District.
September 17, 1998.
Rehearing Denied October 16, 1998.
*33 Louis K. Rosenbloum of Louis K. Rosenbloum, P.A., Pensacola and Robert G. Kerrigan of Kerrigan, Estess, Rankin & McLeod, Pensacola, for Appellant.
C. Miner Harrell and Tracey Scalfano Witt of Wilson, Harrell & Smith, P.A., Pensacola, for appellee Reagan Belcher.
Richard A. Strickland of Strickland & Molhem, P.A., Tampa, for appellees James Bosso and Alvin E. Sommerer.
Belinda B. deKozan of Fuller, Johnson & Farrell, P.A., Pensacola, for appellees Steve Brown, Chriss Family Trust and George Underwood.
Robert P. Gaines of Beggs & Lane, Pensacola, for appellees Tandy Little and John Wicks.
Stephen T. Holman, Pensacola, for appellee Lee Clements.
W.H.F. Wiltshire of Harrell, Wiltshire, P.A., Pensacola, for appellee Philip Miller.
H. Vance Smith of Smith Clark Delesie Bierley Mueller & Kadyk, Tampa, for appellee Chris Ferrara.
John B. Trawick of Shell, Fleming, Davis & Menge, Pensacola, for appellee Chris Tingle.
BARFIELD, Chief Judge.
The appellant, a marina owner, filed a complaint against the owners of sixteen boats stored at the marina for damages which were allegedly caused by their failure to move the vessels from the marina before Hurricane Opal moved ashore at Santa Rosa Sound in October 1995. It now challenges a trial court order dismissing its complaint as barred by section 327.59, Florida Statutes (1995). We affirm.
Appellant's complaint alleged that the boat owners breached their dry storage and wet slip lease contracts by failing to "exercise due care in the occupation and use of the marina premises" when each of them "chose to ignore Plaintiff's requests to move their vessel from the marina during the days before Hurricane Opal, despite the fact that there was adequate time to safely do so, with knowledge that leaving their vessel docked in Plaintiff's marina would likely cause extensive economic damage to innocent third parties" and by failing to "pay MEL'S MARINA for damage that each Defendant's vessel caused to the docks, pilings, bulkhead, utility lines and other property located at Mel's Marina." It also alleged that the boat owners were negligent by making "the deliberate election not to move their boats from the marina, but instead to put Plaintiff's marina and adjacent property owners at risk," when *34 they "were specifically advised, and the information was well publicized, that a hurricane was developing in the Gulf of Mexico and that Gulf Breeze, Florida was well within the reasonable range of probable landfall sites for that hurricane." The boat owners filed motions to dismiss, asserting, inter alia, that the suit was barred by section 327.59, which provides:
(1) After June 1, 1994, marinas may not adopt, maintain, or enforce policies pertaining to evacuation of vessels which require vessels to be removed from marinas following the issuance of a hurricane watch or warning, in order to ensure that protecting lives and safety of vessel owners is placed before interests of protecting property.
(2) Nothing in this section may be construed to restrict the ability of the owner of a vessel or the owner's authorized representative to remove a vessel voluntarily from a marina at any time or to restrict a marina owner from dictating the kind of cleats, ropes, fenders, and other measures that must be used on vessels as a condition of use of the marina.
Appellant challenges the trial court's order dismissing its complaint with prejudice, which found that section 327.59 "bars plaintiff's actions as plead for breach of contract and negligence against all defendants" and that the "allegations of joint and several liability of all defendants for breach of contract are not supported by the terms of the contract or by applicable law," and which noted that plaintiff's counsel "expressed at the hearing that the Court's decision to grant a dismissal should be with prejudice because plaintiff was not able to amend its pleading to include allegations other than what was originally pleaded."
By enacting section 327.59, the Florida Legislature has expressly stated its public policy "to ensure that protecting lives and safety of vessel owners is placed before interests of protecting property" when a hurricane approaches by defining the standard of care required to be exercised in that situation by a boat owner whose vessel is stored at a marina in Florida. Under the statute, the boat owner has no duty to move the vessels from the marina following the issuance of a hurricane watch or warning.[1]
Sua sponte, we ordered the parties to file supplemental briefs addressing the following issues:
1. Whether this action is within the admiralty jurisdiction of Article III, Sec. 2, cl. 3 of the United States Constitution?
2. Whether federal maritime law applies to the decision in this case?

*35 3. Whether application of section 327.59, Florida Statutes (1995), is preempted by federal maritime law?
4. Whether, prior to enactment of section 327.59, the owner of a boat which was lawfully docked at a marina under a valid slip lease agreement that did not require removal of the boat in the event of a hurricane threat owed a duty to the marina owner to remove his boat upon the request of the marina owner during the period prior to issuance of any hurricane watch or warning?
Before addressing our resolution of these issues in the instant case, we deem it appropriate to make several observations. Tort and contract actions arising out of the storing and maintaining of boats in a marina on navigable waters are within the admiralty jurisdiction, see Sisson v. Ruby, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). Concurrent with federal district courts, state courts have jurisdiction over in personam admiralty actions, see Chelentis v. Luckenbach S.S. Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918); Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). However, federal maritime substantive law controls in such an action, unless the matter is one which has great local significance and the state law to be applied does not threaten the uniformity of federal maritime law (the "maritime-but-local" doctrine, which seeks accommodation between federal and state interests). See Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210 (1921).
The elements of a maritime negligence cause of action are essentially the same as the elements of common law negligence, Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). In determining the existence of the first such element (a duty under the law to conform to a particular standard of conduct in order to protect others against an unreasonable risk of harm), the court must balance the probability of an occurrence causing injury to others, the potential extent of the injury, and the expense and effort of adequate precautions to avoid the occurrence. See The Charles H. Sells, 89 F.2d 631 (2d Cir.1937). See also, Rodi Yachts, Inc. v. National Marine, Inc., 984 F.2d 880 (7th Cir.1993); Complaint of Paducah Towing Co. Inc., 692 F.2d 412 (6th Cir. 1982); United States v. Carroll Towing Co., 159 F.2d 169 (2d Cir.1947). The standard of conduct is that of the reasonably prudent person under similar circumstances, taking into account the risk apparent to the person upon whom the duty is imposed (including any duty to investigate the risk of harm to others), the social value of the interest threatened and of the interest which the person is seeking to protect, the ability of the person to avoid the perceived risk, and the circumstances in which the person is required to act. See United States v. Carroll Towing Co.; Restatement (Second) of Torts §§ 283, 289-93 (1965). The standard of conduct required of a reasonable person may be established by a legislative enactment. Restatement (Second) of Torts §§ 285-86 (1965).
Having considered the briefs submitted by the parties and the results of our own research, we find that the instant action is within the admiralty jurisdiction and that federal maritime law applies. We further find that section 327.59 is not preempted by federal maritime law, because the issue addressed by the statute, protection of the lives and safety of persons during the threat of a hurricane, is a matter of paramount local concern to the citizens of Florida and because the statute does not threaten the uniformity of federal maritime law, which does not specifically address the issue of evacuation of marinas in the face of a hurricane threat.
The complaint in the instant action did not specify whether a hurricane watch or warning had been issued when the marina owner requested the boat owners to move *36 their vessels from the marina. It is therefore necessary for us to determine whether, regardless of section 327.59, the owner of a boat which is lawfully docked at a marina, under a valid slip lease agreement that does not require removal of the boat in the event of a hurricane threat, owes a duty to the marina owner to remove his boat upon the request of the marina owner during the period prior to issuance of any hurricane watch or warning. We have found no statutory or case law imposing such a duty on the boat owner in that situation.[2] We can identify no logical reason to impose such a duty, in light of the insufficient probability, actual or apparent, at any time prior to issuance of an *37 official hurricane watch or warning, of a hurricane causing the boat owner's vessel to damage the marina.[3] We further construe section 327.59 as articulating a long-held public policy of the State of Florida "to ensure that protecting lives and safety of vessel owners is placed before interests of protecting property," which would preclude imposition of such a duty.[4]
The trial court properly construed section 327.59 as barring the marina owner's action for property damage based solely upon the failure of the defendant boat owners to move their vessels from the marina after issuance of a hurricane watch or warning.[5] We find as a matter of law that, during the period prior to issuance of any hurricane watch or warning, these boat owners owed a duty to the marina owner to exercise reasonable care for the protection of marina property, but that duty did not include an obligation to remove their boats upon the request of the marina owner. The order dismissing the complaint with prejudice is therefore AFFIRMED.
ALLEN and LAWRENCE, JJ., concur.
NOTES
[1] The parties do not dispute that the statutory reference to "hurricane watch or warning" refers to an official pronouncement by the National Weather Service, part of the National Oceanic and Atmospheric Administration (NOAA) of the U.S. Department of Commerce, which publishes a "National Hurricane Operations Plan." In cooperation with the American Red Cross and Federal Emergency Management Agency (FEMA), NOAA and the National Weather Service also publish a public information brochure, "Hurricanes... unleashing nature's fury: A PREPAREDNESS GUIDE." These publications, of which we take judicial notice, define terms relevant to our discussion (emphasis in the original). In NOAA's May 1997 Hurricane Operations Plan, "Hurricane" is defined as "[a] warm-core tropical cyclone in which the maximum sustained surface wind speed (1-min mean) is 64 kt (74 mph) or more." Its current brochure, revised in March 1996, defines "Hurricane" as "[a]n intense tropical weather system with a well defined circulation and maximum sustained winds of 74 mph (64 knots) or higher."

The Hurricane Operations Plan defines "Hurricane Watch" as "[a]n announcement for specified coastal areas that a hurricane or an incipient hurricane condition poses a possible threat, generally within 36 hours." The brochure states that "[h]urricane conditions are possible in the specified area of the Watch, usually within 36 hours," and that during a hurricane watch, residents of the area are advised to "prepare to take immediate action to protect your family and property in case a Hurricane Warning is issued." The Hurricane Operations Plan defines "Hurricane Warning" as "[a] warning that sustained winds of 64 kt (74 mph) or higher associated with hurricane conditions are expected in a specified coastal area in 24 hours or less" and advises that "[a] hurricane warning can remain in effect when dangerously high water or a combination of dangerously high water and exceptionally high waves continue, even though winds may be less than hurricane force." The brochure states that "[h]urricane conditions are expected in the specified area of the Warning, usually within 24 hours," and that when a hurricane warning is issued, residents of the area are advised to "[c]omplete all storm preparations and evacuate if directed by local officials."
[2] In United States v. Bruce Dry Dock Co., 65 F.2d 938 (5th Cir.1933), a lightship broke from her moorings during a hurricane and destroyed a floating dry dock. The dry dock owner alleged that the master of the lightship refused to comply with its request, two days before the hurricane, to move the vessel from the wharf and anchor in the bay away from the shipyard, and that the master and crew failed to slacken the mooring lines at the height of the hurricane. The trial court concluded that the evidence presented supported these claims, that it was common knowledge that the storm was expected to strike the area when the master was requested to remove the vessel from the wharf, that the vessel was equipped with two heavy mushroom anchors, and that it was the consensus of opinion among the expert witnesses that the vessel would have been in a safer position if she had been anchored in the bay. The appellate court held that "it was negligence under the circumstances, according to all the testimony, to leave the vessel in the slip insecurely moored to the wharf, there to be buffeted about by the hurricane."

In The Havana, 89 F.2d 23 (2d Cir.1937), a steamship broke her dry dock moorings in a severe storm 23 hours after the Weather Bureau had issued hurricane warnings. The trial court dismissed a suit for damages she had caused to another docked steamship on the ground that she was made fast in a manner "to withstand any weather that even with the storm warnings might be anticipated." Reversing the decree dismissing the suit, the appellate court stated:
The collision of the Dalhart with a moored vessel called for an explanation and put upon her the burden of showing that the exercise of reasonable nautical skill would not have prevented the accident. In view of the storm warnings and the intensity which is known frequently to accompany such storms as the warnings foretold, we think the respondent did not sustain the burden and show such care as the situation demanded.
In United States v. State Road Department of Florida, 189 F.2d 591 (5th Cir.1951), four liberty ships anchored in Pensacola Bay dragged anchor during a severe evening rain and wind squall, causing substantial damage to a bridge. The Weather Bureau had predicted "showers and thunderstorms" for that evening, but gave no special wind warnings, and the parties did not dispute that the windstorm came on suddenly. In a suit under the Federal Tort Claims Act, the trial court overruled the defenses of inevitable accident and "Act of God," finding that the actions and inactions of those in charge of the liberty ships "exemplify a failure to exercise that degree of care which the circumstances required." The appellate court affirmed, rejecting the claim that the trial court erroneously imposed upon the masters and officers prior to and during the squall "a standard of exercising a very high or extra-ordinary degree of care."
In Twery v. Houseboat Jilly's Yen, 267 F.Supp. 722 (S.D.Fla.1967), a houseboat broke away from its permanent moorings during "an exceptionally strong and dangerous hurricane" and damaged nearby property. The trial court found that the houseboat had been properly moored by an expert two hours prior to "[t]he first definite United States Weather Bureau advisory that Hurricane Betsy was a definite threat to the South Florida area," that the houseboat's owners "used reasonable precaution under the known circumstances," that there was no showing that the houseboat "could or should have been made more secure or that it should have been moved prior to the hurricane," and that the houseboat "broke away from its moorings as a result of an inevitable accident or as an act of God."
In Ladner v. Bender Welding and Machine Co., Inc., 336 F.Supp. 1264 (S.D.Miss.1971), the owners of two yachts anchored on a lake on the Mississippi coast during Hurricane Camille sued the owner of a larger yacht anchored on the lake for damages caused to their vessels, alleging negligence in its handling immediately prior to and during the hurricane. The trial court found that the intensity of the storm was unprecedented, that its course and direction were "very uncertain and unpredictable until a very few hours before it actually struck," that the defendant vessel "exercised due and proper care," and that under the circumstances, neither plaintiff had shown by a preponderance of the evidence that the defendant vessel "was guilty of any kind of negligence which proximately caused or contributed to its damage and injury." It found that the evidence showed that "as an inevitable and unavoidable result of an act of God, the plaintiffs... have suffered damages which human skill and precaution, and a proper display of nautical experience could not have prevented.".
While these cases support the imposition of a duty on a vessel owner to take reasonable care for the protection of another's property which may, in certain circumstances, include moving the vessel from a marina after an official storm warning has been issued, they arguably support the proposition that prior to such a warning, the standard of care is less stringent.
[3] Prior to issuance of a hurricane watch or warning, the duty owed by the boat owner to the marina owner, to exercise reasonable care to protect the marina from foreseeable harm, would not appear to include a duty to remove the boat from the marina at the marina owner's request, because at that time the risk of harm to the marina from the effects of a hurricane hitting the marina while boats are stored there is not so great that a reasonably prudent person would undergo the expense, inconvenience, and possible personal danger of removing the boat, even assuming that a safe harbor were available and could be reached.
[4] We leave for another time, because it was not presented in this case, the question of whether so-called "hurricane clauses" in slip lease agreements (requiring the boat owner to remove the vessel from the marina upon threat of hurricane) would be void as against this public policy, even in the absence of section 327.59.
[5] We note that boat owners have a duty to take all other reasonable precautions to protect the marina from harm in the face of the hurricane threat, including the duty to properly moor the boat, the duty to remove loose objects from the deck, and the duty to properly tie down anything that cannot be removed from the deck and may cause damage.