## THE BEACON.

## THE CITY OF BALTIMORE.

### No. 1972.

District Court, D. Maryland.
March 8, 1934.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (by William H. McGrann, of New York City, and Emory H. Niles and Theodore R. Dankmeyer, both of Baltimore, Md.), for libelant and cross-respondent.

Janney, Ober & Williams, of Baltimore, Md. (by Robert W. Williams and Southgate L. Morison, both of Baltimore, Md.), for respondent and cross-libelant.

WILLIAM C. COLEMAN, District Judge.

This is a collision case between two vessels in which the libelant, Standard Shipping Company, owner of one of the vessels, the tanker Beacon, seeks to impose the sole liability for the collision upon the other vessel, the steamship City of Baltimore, charging that vessel, first, with being unseaworthy, and, secondly, with having been improperly navigated. By its cross-libel the Baltimore Mail Steamship Company, owner of the steamship City of Baltimore, seeks to impose sole liability on the Beacon, charging that this vessel was improperly navigated, and also claiming that the City of Baltimore

was properly navigated, and is exonerated from all blame by inevitable accident, namely, a breakdown in her steering engine which rendered her out of control and placed her in the path of the Beacon.

The collision occurred in full daylight, on July 12, 1933, at 6:15 p. m., off No. 9 Buoy in Craighill Channel, Baltimore Harbor, while the City of Baltimore was outbound and the Beacon was inbound. Weather conditions were distinctly favorable, clear, little wind, the tide flood.

After exchanging signals for a port to port passing, one blast, while the vessels were about a mile apart, each in proper position, on her own starboard side of the channel, the City of Baltimore proceeding at about thirteen knots and the Beacon ten knots, the City of Baltimore began to sheer to port when within from a quarter to a half mile of the Beacon, and finding it impossible to correct this sheer because of the failure of her rudder to respond to wheel movements, she sounded a series of danger signals and simultaneously went full speed astern. Upon seeing the sheer of the City of Baltimore and hearing her danger signal, the Beacon did not alter her course to starboard or port, but promptly went full speed astern. Nevertheless, the two vessels collided. The City of Baltimore, with headway still slightly on, was rammed by the Beacon just aft of her, the City of Baltimore's, starboard chain-locker, while the Beacon was admittedly still making headway of six knots. The City of Baltimore gave no signal of her astern movement nor did the Beacon. There is a conflict in the evidence as to whether the Beacon answered the danger signals of the City of Baltimore, the master and pilot of the latter claiming that she did not, while the master and pilot of the Beacon testified directly to the contrary. But it becomes unnecessary to determine this point, because the master and pilot of the Beacon both admitted that even had they heard this signal from the City of Baltimore, their action with respect to the Beacon would have been the same.

The City of Baltimore was badly damaged, her No. 1 and No. 2 holds were flooded, and the stem of the Beacon was also damaged to a considerable extent; and as a result of the collision, fire broke out in the forward part of the Beacon.

After the collision, it was discovered that the failure of the City of Baltimore's rudder to respond to the wheel movements was due to the slipping of the yoke on the valve stem of the steering engine. Before and at the moment of collision the City of Baltimore was being steered by her telemotor mechanism, which was in first class condition. No effort was made to change over to either the electric or hand-steering mechanism, because the former also operated on the steering engine and the change would have required one minute to complete; and the latter mechanism was not capable of control from the bridge. Both of these mechanisms were also in first class condition. The period that elapsed between the commencement of the City of Baltimore's sheer and the actual collision was not more than a minute and a half. At the point of collision the channel was some 600 feet wide.

With those facts, which the court has found, it will thus be seen that the questions raised by the libel and cross-libel may be stated as follows:

First, Was what occurred on the City of Baltimore with respect to her steering engine an inevitable accident? Second, If so, was it the sole cause of the collision or did either vessel, or both of them, directly contribute to the collision by reason of improper navigation?

Taking up these questions in the order given, since the City of Baltimore has asserted the defense of inevitable accident, the burden of proof rests upon it throughout the case to establish this fact by the clear weight of the credible evidence. The rule is that which is laid down in the case of The Edmund Moran (C. C. A.) 180 F. 700, which is that in order to sustain this burden the party alleging it must do one of two things; either must show what was the cause of the accident and that the result of that cause was inevitable; or must show all the possible causes, one or the other of which produced the effect; and must further show with regard to every one of these possible causes that the result could not have been avoided.

The court concludes that this burden has been met by the City of Baltimore for the following reasons: First, there is no credible evidence in contradiction of the fact that the loss of control of the City of Baltimore was due to the slipping of the yoke on the valve stem; second, equipping the valve stem in this fashion was standard equipment, long in use on vessels of the type of the City of Baltimore as well as on vessels of various other kinds; third, this mechanism was in first-class condition when installed; fourth, no similar breakdown had ever previously occurred on this or any other vessel so far as known to the manufacturers of the equip-

ment, or to any one else; fifth, it had been subject, since its installation, to inspection which, as regards both extent and frequency, was adequate under the circumstances.

On behalf of the Beacon it is asserted that the City of Baltimore must do more than show this; that the defense of inevitable accident fails if the proof falls short of disclosing not merely the exact breakdown which caused the accident, but what indubitably caused the particular part of the machinery to break down. That is to say, it is claimed that the City of Baltimore must prove the actual origin of the trouble, whether it was inherent in the design, the workmanship, or the material that went into the mechanical part or parts in question, or was brought about by some particular stress or strain; and that it is not enough merely to prove that due care and diligence were used in the installation and upkeep of the part or parts.

It is conceded that such a requirement has not, in fact, been met, because none of the witnesses has stated that he could, in fact, account for what happened, that it was a baffling occurrence, readily understandable after the event, but not, in fact, traceable with certainty to any one thing. But we cannot impose such a requirement under the given circumstances, because to do so would, in effect, be declaring that every shipowner installs and uses machinery of this kind at his peril, that he insures it will never break down. Surely the purchasers and users in good faith of a piece of machinery of this kind should not be charged with a knowledge of that article, or of what it may or may not do at all times under all conditions, superior to that which all those who have produced it, and from whom it is acquired, possess. No, the test of inevitable accident is met when, first, the cause of the accident is disclosed within the limits of the most reliable expert knowledge peculiar to the given art, and, second, when it is conclusively shown that with the exercise of reasonable care, based upon such knowledge, the accident did nevertheless in fact occur.

Such is the situation which the court finds in the present case. Both of these prerequisites have been conclusively established. None of the cases cited are controlling in contradiction of this conclusion, because they disclose some factor that distinguishes them, some shortcoming in the proof respecting either one or both of these prerequisites.

The contention that it may not have been the breakdown in the steering engine that was the proximate cause of the sheer of the City of Baltimore, but rather her "smelling the bank" on the right of the channel, requires scarcely more than passing notice, because totally unsupported by the credible testimony. It is asserted on this point that since it is uncontradicted that after the collision the rudder of the City of Baltimore was found to be to the right some 45 degrees, this fact supports the "smelling the bank" theory, or at least refutes the testimony to the effect that her helmsman could not obtain a right rudder just prior to the collision. But suffice it to point out that there was in fact no bank on the right side of the channel such as could have produced the suggested suction, there being only a gradual trend of 30 or 35 feet inside the channel, and outside of that the depth was in excess of the draft of the City of Baltimore for a wide area, the land being about a mile distant. Also, the rudder indicator was in proper working order and did, in fact, record a failure to obtain a right rudder.

The Beacon's own witnesses admit that the slipping of the yoke on the valve stem was sufficient to put the vessel out of control. Furthermore, the breakdown may very well have been intermittent just before or after the collision, as is evidenced by the fact that after the collision, control twice failed, and was twice restored, before the cause of the trouble was found and remedied.

■ We come, then, to the remaining question, whether the navigation of either one or both of the vessels was faulty. First, as to the manner in which the City of Baltimore was navigated, we conclude that the only error that may fairly be laid to her master or pilot was that the full speed astern signal was not given after the danger signal was given by her. But we feel that the emergency conditions which gave the right to invoke rule 27, ipso facto revoked the necessity to advise the Beacon of the maneuver astern. But in any event it becomes unnecessary to answer this question with precision because both master and pilot of the Beacon testified that had they received such signal they would not have steered their vessel differently. And it appears from the evidence that there was in fact no confusion as to this stern movement by the City of Baltimore; that is, that the Beacon was well aware of it.

Lastly, as to the navigation of the Beacon, we also fail to find any negligence there. The situation was one which called for quick thinking and quick acting. A choice of three possible courses lay open. There was little time within which to speculate, not more than

four or five times the length of either vessel separated them. Neither could completely lose headway in that distance. The Beacon did what seems to the court to have been entirely reasonable under the circumstances, she immediately went full speed astern.

The other alternatives were, first, to have gone to starboard, and, second, to have gone to port. As to the first of these other alternatives, it is reasonable to assume that by the adoption of it the Beacon would have put both herself and the City of Baltimore in perhaps greater danger. She might have laid her course directly across the bow of the City of Baltimore and might, in addition, have run aground by running outside of the channel.

As to the remaining alternative which the City of Baltimore has urged that the Beacon should have taken, namely, a turn to port, and the use of one of her engines to give her the most complete and effective swing, that is a reasonable contention, and it is possible that had she done so she would have swung either entirely clear of the City of Baltimore, or would, at worst, have merely grazed her side and slipped by. Indeed, the calculations, minutely made, indicate that entire clearance probably would have occurred. But, after all, that is paper calculation and cannot always be allowed to offset the action or reasoning of the human mind, squarely facing a dilemma. In other words, such calculations are fraught with speculation. While one person's judgment might, on the facts as stated after the event, appear to be better than the judgment of another person, equally or even more skilled, who actually found himself in the predicament, nevertheless it does not follow that the judgment of this latter person is so faulty as to imply want of due care. Of the two possible decisions, his may be the less wise, but it does not follow that it amounts to culpability. Indeed, had the Beacon tried the proposed maneuver, and the starboard to starboard passing had failed, she might have rammed the City of Baltimore broadside and at greater speed, which would have been vastly more serious.

There is a great deal of data in the case which has not been referred to, such as the technical computations, the attempts to ascertain precisely the time when the vessels reached given points, and a great deal of other data bearing upon the two main questions at issue. But the findings of fact which have just been given seem to the court to cover all of the material points at issue. A case of this kind is not to be decided by rule of thumb, because the human equation plays a very strong part. Therefore, the court reaches the conclusion that it does, not without having considered these refinements of computations and calculations, such as those shown by the graphs of the gyro-compass, but feeling that they are of secondary importance when the major facts are understood, and the working of the minds of the men in charge of both vessels is fully ascertained.

To summarize, therefore, both vessels are exonerated, and, accordingly, a decree will be signed dismissing both libels, each party to pay its own costs.