## UNITED STATES v. EASTERN TRANSP. CO.

### No. 2604

District Court, D. Maryland.

July 3, 1943.

C. Ross McKenrick, Asst. U.S. Atty., of Baltimore, Md., Edward L. Smith, Sp. Atty., Department of Justice, of Washington, D.C., John Henry Skeen (of Beeuwkes, Skeen, Oppenheimer & Frank), of Baltimore, Md., and Christopher E. Heckman (of Foley & Martin) of New York City, for respondent.

COLEMAN, District Judge.

This is a suit in admiralty by the United States to recover the cost of replacing an emergency dolphin or pile in the Chesapeake Canal near Chesapeake City, Maryland, alleged to have been damaged through the negligent navigation of the Tug T. J. Hooper, owned by the Eastern Transportation Company, the respondent, while towing the Barge Cohassett through the Canal at about five a.m., on the morning of February 25th, 1940.

This dolphin was one of a group of several piles located on the southern side of the Canal, outside the channel and about two hundred and fifty yards east of the drawbridge. It was the most westerly of several similar groups of dolphins placed there as emergency aids to navigation, namely, to enable vessels westbound through the Canal to tie up to them in the event, after signalling for the draw to open, such vessels might have to wait before passing through the draw, and therefore might have to check their movement or counteract wind or current. Similar aids stood on the west side of the drawbridge. Just east of the drawbridge the Canal channel bears considerably to the left, and there was a green flashing light on the south bank and a red flashing light on the north bank of the Canal, to the east of the dolphins. The latter were not lighted. The dolphin claimed by the Government to have been damaged stood about twelve or fifteen feet out of the water at the time in question.

In all, five witnesses testified but not one of them saw the alleged collision.

The Cohassett is an iron whaleback barge, about 300 feet long. On the night in question, she was fully laden with coal, and was being towed on the starboard side of the Tug T. J. Hooper, which was about half as long as the barge, the latter's stern sticking out about 10 feet beyond the stern of the tug. Therefore, the barge's bow extended considerably ahead of the tug's bow.

The master of both the tug and the barge testified, and denied flatly that either of their vessels had had any collision while passing through the Canal. The master of the former testified that he had been making trips through the Canal for some thirty years, and had averaged four

or five round-trips each month. He further testified that on the night in question, he had played his searchlight on these groups of dolphins, and recalled that in the first group, one of the dolphins was bent over. He claims to have made the required left turn after passing through the draw. The barge master testified that he received from the master of the tug, and carried out, an order to port his helm. The barge was equipped with steam steering gear. Her master further testified that she had only about three feet freeboard while passing through the Canal, and that the top of the dolphin or dolphins was about level with his eye as he stood in his wheelhouse.

Unfortunately, the bridge-tender on duty at the time the tug and tow passed through the draw died before the trial. The bridge-tender who was on duty up to midnight of the same evening, testified that he did not and could not see, because of the darkness, any of these dolphins, except in outline, when he went off duty, but he further testified that he received no report of any previous injury having occurred to any of them.

Another witness was dispatcher Wilfong, of the United States Engineers Department, who was on duty at the time of the alleged accident in his office on the south bank of the Canal, about 1,200 feet east of the draw, and about 300 feet east of the dolphin in question. While he admitted that he did not see any collision, nevertheless, he was emphatic in his statement that, after watching the barge and tow,—which he could see only in outline because of the darkness,—come through the draw, at a speed estimated by him to have been about seven miles an hour, he heard a noise and assumed there had been a collision by one or the other of these vessels with a dolphin; and that, accordingly, he hailed the captain of the T. J. Hooper, calling to him that he had struck a dolphin, but got no reply. He said he assumed the master of the tug did not hear him. So he radioed the patrol boat at the lower end of the Canal to get a report from the master of the tug as she cleared the Canal. The master admits that he was approached in this regard, but refused to give any report, claiming that he had had no collision. This dispatcher admitted that he had no occasion to regard the condition of the dolphins when he

went on duty at midnight, and that at the time of the alleged collision, he could not see the dolphins because of the darkness.

The only additional witness was another bridge-dispatcher who went off duty at midnight. His testimony was meagre and inconsequential. He testified that he did not see the dolphins after darkness set in, and had received no report of any collision up to that time. There is no evidence of any adverse weather conditions.

Information taken from the bridge-foreman's report and stipulated as part of the evidence, showed that between six p.m. and midnight of February 24th, five vessels had passed through the draw, two of them being tugs towing two barges.

■ It is conceded, and we think correctly, that admiralty has jurisdiction of a suit such as this, for damage caused to an aid to navigation. In Daullut & Williams Co. v. United States, 268 U.S. 33, 45 S.Ct. 411, 69 L.Ed. 832, the Supreme Court held that admiralty had jurisdiction of a suit to recover damages for injuries by merchant vessels belonging to the United States, to clusters of piles, constituting no part or extension of the shore, and used, as were the piles or dolphins in the present case, as aids to navigation,—i.e. for tying up vessels, so as to avoid anchor dragging, etc. The Court said (268 U.S. at pages 34, 35, 45 S.Ct. at page 411, 69 L.Ed. 832): "The damaged piles constituted no part or extension of the shore, as wharves, bridges and piers do. Although driven into the bottom of the river, and attached in that way only to the land, they were completely surrounded by navigable water, and were used exclusively as aids to navigation. We think injuries to them by a ship come fairly within the principle approved by The Blackheath, 195 U.S. 361, 25 S.Ct. 46, 49 L.Ed. 236, and The Raithmoor, 241 U.S. 166, 36 S.Ct. 514, 60 L.Ed. 937. See Hughes on Admiralty, 2d Ed., § 100." See also Robinson on Admiralty, pp. 50–69.

■ Also, it is well established that a vessel under way is presumed to be at fault if she collides with a vessel not in motion, properly moored; and we will assume that this rule applies equally to collisions with fixed aids to navigation. See The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943. However, such presumption is no more than prima facie, and

we feel that in the present case the respondent's testimony is the more credible and sufficient to overcome any such presumption, and to place the burden squarely upon the Government to prove that those in charge of the navigation of the Tug T. J. Hooper or her tow, the Barge Cohassett, or both, were at fault.

A decision in the present case is rendered somewhat difficult because of the total absence of testimony by any one claiming to have seen the collision. The strongest testimony produced on behalf of the Government is that of the bridge dispatcher to the effect that, as the tug and barge were seen approaching the point where he was located on the southern bank of the Canal, he heard a noise which he thought unmistakably resulted from a collision between this tow and one of the dolphins. From this testimony, viewed in the light of the admitted fact that, at the time, no other vessel was, or could have been, in this part of the Canal, and with the absence of any testimony that the dolphin had been previously damaged, the Government maintains that the most reasonable, if not in fact, the necessary conclusion is that respondent must be held liable. However, we are not willing to say that it is not just as reasonable to accept the testimony of the master of the tug and the barge, and the probability that in the passage through the Canal, some other vessel, at some prior time, damaged the dolphin.

It is true there is no evidence of unfavorable conditions of weather or current, or that the Government should have placed lights on the dolphins. Also, it is possible that the barge might have sideswiped the dolphin without those aboard of her or the tug seeing this occur or feeling the impact, because of the great size of the barge and her cargo. But, had there been such a collision, presumably it would have left its damage mark upon the barge, and of this there is no evidence. Nor was any testimony offered from those on the patrol boat who accosted and interviewed the master of the tug, at the instance of the dispatcher near the draw, when the tug left the Canal.

The Court has had an opportunity to see and to hear, on the witness-stand, the various witnesses and, therefore, to appraise their statements and to determine, first-hand, to which should be accorded the greater degree of credibility. After applying this test, the Court is the more inclined to accept the statements of the master of the tug and of the barge.

Finally, it is, of course, conjectural whether, if the Court could have had the benefit of testimony from the man tending the draw at the time of the alleged accident, this would have clarified the situation in view of his relatively close proximity,—600 feet—to the dolphin claimed to have been struck and his elevated location. In any event, the fact remains that the proof, as presented, is inadequate to justify a finding in favor of the Government. It may be that the barge did come in contact with, and scrape one or more of the dolphins, which might account for the noise dispatcher Wilfong claims he heard, but still there is no proof that such contact, and not a previous collision by some other vessel, actually caused the amount of damage claimed, namely the breaking of the dolphin and the need for its replacement at a cost of $1,200 which is the amount sued for.

For the reasons given, the libel must be dismissed.