## THE MEANTICUT.
### THE F. H. BEDFORD, JR.

District Court, S. D. New York.
Dec. 26, 1945.

Burlingham, Veeder, Clark & Hupper, of New York City (by Chauncey I. Clark and C. E. Wythe, both of New York City) and Terriberry, Young, Rault & Carroll, of New Orleans, La. (by Joseph M. Rault, of New Orleans, La.), for Lykes Bros. Steamship Co., Inc., owner of the Meanticut.

Hill, Rivkins & Middleton, of New York City (by Thomas H. Middleton, of New York City), for Amtorg Trading Corporation.

Kirlin, Campbell, Hickox & Keating, of New York City (by Edwin S. Murphy, Ira A. Campbell, and Helen C. Cunningham, all of New york City), for Panama Transport Co., owner of the F. H. Bedford, Jr.

GODDARD, District Judge.

In Admiralty.

Libel by Lykes Brothers as the owner of the steamship Meanticut and as bailee of cargo to recover damages sustained by the Meanticut and her cargo as a result of a collision with the motor vessel Bedford, and cross-libel by the Bedford's owner to recover damages she sustained. Subsequently Amtorg Trading Corporation intervened for cargo on the Meanticut.

The collision occurred in New York Harbor about 5 a. m. on April 9, 1942.

The Meanticut, a steel screw steamship, 6061 gross tonnage, 402.5 feet in length, and 53 feet beam, lay with cargo at anchor off Stapleton, Staten Island, in the main ship channel at a point variously estimated to be 500 to 800 yards, northwest from the Junction Buoy marking the junction of the main ship channel and the Bay Ridge Channel. She was showing the regulation anchor lights; tide last of the flood, visibility good. Shortly before 5 a. m. the Bedford, outward bound, sheered off her course to starboard and her stem struck the port side of the Meanticut, causing substantial damage.

The Bedford, built in England in 1930, a twin screw motor vessel of 10,844 gross tons, 521.4 feet in length, 70.2 feet beam, with a cargo of fresh water and general stores, left Pier 4, Constable Hook, Bayonne, New Jersey, about 4:30 a. m. bound for Aruba. On her bridge were a Sandy Hook pilot, her Master, her Third Officer, who was at the engine telegraph, and a helmsman at the wheel. Her Chief Officer and boatswain were on the forecastle head. She was being steered by her port electric steering system.

After backing out of her berth she proceeded toward the main ship channel and while approaching the channel, observed the Meanticut about 2000 feet away anchored in the channel. The main ship channel at this point is about 2400 feet wide, and according to the Bedford's pilot there was ample room to pass the Meanticut as she lay 700 or 800 feet to the starboard of the Bedford's course. The Bedford proceeded down the channel at full speed swinging to the right under right rudder, heading to pass between the Meanticut and the Bay Ridge Junction Buoy. Upon reaching the heading for such passage the pilot ordered the wheelsman to ease the helm and shortly thereafter "check her," to check the swing of the bow to the right; the wheelsman reported that the wheel was to the left but the rudder did not answer. This was less than a minute before the collision. The pilot ordered the rudder amidships and hard left. These orders were executed but had no effect on the rudder which remained at about 20 degrees right. The pilot ordered the port engine full speed astern and a few seconds later full astern on both engines. At this time

the Bedford was about a ship's length from the port side of the Meanticut. These orders were followed by an order to drop the port anchor in an effort to try to pull the Bedford away from the Meanticut, but there was not time to get the anchor down. The engine room responded to the full astern order, but the Bedford continued to swing and struck the Meanticut near the after end of the amidship house at an angle of about 60 or 75 degrees. After the collision the order to drop the Bedford's anchor was countermanded and she backed away and anchored nearby. Her rudder remained at approximately 20 degrees right for about ten minutes after the collision when it came back to amidships position corresponding with the position of the wheel. At 6:20 a. m. she shifted her anchorage where she remained until 3:55 p. m. when she proceeded to a Staten Island pier. While at her first anchorage without her engines running, the steering gear was tested by turning the wheel left and right and no difficulty was experienced, the rudder properly responding to the steering wheel. Her Chief Engineer and the ship's electrician inspected her steering gear and found everything in satisfactory working order and could not discover the cause of the trouble. While proceeding to the Staten Island pier, using her port steering gear, it failed three times in the same manner as before the collision, jamming at about 20 degrees right, but shortly after each failure, the rudder came back to amidships when the wheel was amidships.

At about 8 a. m. on April 9th, two company representatives boarded the Bedford and during the forenoon some naval officers came on board and after trying out the steering gear found that "it worked perfectly." After the Bedford had moved to the pier the Chief Engineer and the ship's electrician made another inspection checking connections, motors, armatures, brushes, wiring throughout the engine room, steering engine room, and all the steering control apparatus, but did not find the cause of the rudder failure.

The next morning a thorough inspection was made by McCann of Hose-McCann Corporation, shore electricians, and the ship's owner repair inspector. After stationing his assistant and the ship's electrician in the steering engine room to watch the operation of the steering equipment, the cover of the switch box having been removed, McCann, in the wheelhouse, operated the port steering gear system with the port steering engine running. As McCann rotated the wheel those near the switch box saw smoke coming from some of the wires in the box and the rudder jammed at about 20 degrees right. McCann came from the bridge and knowing that the rudder was jammed at about 20 degrees right realized that the trouble must be with wires 2 and 3. It was found that these wires had been in contact where the smoke had appeared causing an arc [short circuit]. McCann separated wires 2 and 3 with a pencil and the steering gear functioned normally. When the pencil was removed the wires came in contact again, and an arc was again formed and the steering gear failed to function. He said that upon examining wires 2 and 3 he saw a hole approximately an eighth of an inch in diameter in the insulation on each wire where the insulation was charred.

The Meanticut's libel alleges several faults on the part of the Bedford but the important one and the one principally relied upon is that the Bedford's "steering gear was not in good order and condition and was negligently permitted to jam to starboard."

The Bedford's defense is that the failure of the steering gear control "was solely due to a latent defect not discoverable by the exercise of reasonable care" and that the "collision was an unavoidable accident on the part of the Bedford."

The cross-libel charges the Meanticut with being solely at fault for anchoring in the main ship channel and for failing to maintain a proper anchor watch. The cross-libel may be disposed of at the outset. Just where the Meanticut was anchored is not definitely proved, but the pilot of the Bedford testified that the anchorage was crowded and the Meanticut could not anchor further to the westward. There was more than 1000 feet between the port side of the Meanticut and the easterly side of the main ship channel. Accepting the lowest estimates there was 500 to 750 feet of clearance between the Meanticut and the Bedford, and the Bedford's pilot admitted that he saw the Meanticut at anchor, and had plenty of room to pass and "would have no difficulty in passing her had it not been for this steering trouble." Although in the channel, the Meanticut did not obstruct the passage of other vessels. This was not the cause of the collision; it was a condition which the Bedford should have

206

taken into consideration in navigating. Strathleven Steamship Co. Ltd. v. Baulch, 4 Cir., 244 F. 412, certiorari denied 245 U.S. 663, 38 S.Ct. 61, 62 L.Ed. 537; The Perserverance, 2 Cir., 63 F.2d 788; The Montrose, D.C. 47 F.Supp. 719; The Randa, D.C., 56 F.Supp. 508. See Bohemian Club, 320 U.S. 462, 64 S.Ct. 225, 88 L.Ed. 168.

■ The evidence shows and proctors for the Bedford concede that the Meanticut can hardly be criticized for failing to pay out chain and drop back with the tide so as to avoid the Bedford as there was not sufficient time even for the Bedford to get her own anchor down. Therefore, it is apparent that the charges of fault in the cross-libel have not been sustained.

■ The real issue is presented by Bedford's defense of inevitable accident—a latent defect. Relying on this defense the claimant must prove it if it is to be relieved of liability. The claimant must either point out the precise cause and show that it was in no way negligent, or must show all possible causes, and that it is not at fault in connection with any one of them. In re Reichert Towing Line, 2 Cir., 251 F. 214, certiorari denied 248 U.S. 565, 39 S.Ct. 9, 63 L.Ed. 424; The Moran, D.C., 12 F.Supp. 493.

There is no direct evidence of the precise cause of the short circuit between wires 2 and 3 so the claimant must show all possible causes and that it was not at fault in connection with any of them. The Bedford submits three possible causes—

1. Cracking of the insulation under the tape on the wire.

2. A manufacturing defect in the insulating compound under the tape, such as a void formation or blow hole.

3. Mechanical injury to the insulation which might have taken place in the factory before the cable was shipped out, during installation, after installation.

Libelant urges as another not only possible but probable cause, namely, that the insulation on the wires in the switch box had deteriorated, become brittle and cracked apart; that the various wires in the switch box were loose; not properly routed or separated and that the vibration of the ship caused the wires to rub against each other and possibly wear away the insulation, causing the short circuit. Libelant contends that this condition of the wires and insulation should have been known and remedied

if the care required by the existing conditions had been exercised.

The Bedford was built in 1930 in England; had diesel engines and electric steering gear, and a German steering control system constructed by Allgemeine Elektricitate Gesellshaft, hereinafter referred to as the A.E.G. system; the motor and operating units of the system were manufactured by Atlas-Werke, Bremen. The steering system consisted of two separate electric steering systems—one port, the other starboard. There was also a hand steering gear at the stern in the steering engine room so designed that the electric steering control may be discontinued by lever and the hand gear put into operation. All agree that the failure of the steering gear was caused by the short circuit between wires 2 and 3 in the transfer switch box in the steering engine room. A detailed description of the A.E.G. system and its operating principles seems unnecessary; it will be enough for present purposes to describe the switch box and the wires where the trouble occurred.

Wires 2 and 3 were a part of the system for controlling the movements of the rudder; they did not furnish the power for moving the rudder; they were included in a group of 16 wires or conductors which served the port bridge control. They were small copper wires and entered a transfer switch box from the bottom in an armored cable; they carried a current of ¼ ampere at 220 volts. Another armored cable containing a similar number of wires which served the poop steering control or station also entered the switch box. A third armored cable led out of the transfer switch box to the port rudder watcher. The armored cables were held in place by a binder block in the bottom of the switch box. The lead sheath of the armored cable was cut away just above the binder block and the loose wires with a substantial amount of slack in them were led to terminals above the binder block where they were each made fast. Above the binder block the wires lay in a loose unseparated mass. There were a total of 48 wires or conductors in the switch box; 33 of them were active wires and 15 spares. The wires had rubber insulation and were wound with cotton fabric. The switch box was of metal—18 inches wide, 10 inches high and about 8 inches deep, and was located on the forward bulkhead of the steering engine room and had a removable cover. That the short circuit resulted from the two wires with defective insulation

coming in contact is clearly indicated by the evidence. Has the claimant sustained its burden of showing that although the insulation was defective, it exercised reasonable care and that the wires were routed or arranged in a reasonably safe manner?

These wires were installed in 1930 when she was built and equipped with the A.E.G. steering system which is a recognized steering system.

At the request of a representative of the claimant, James Farrelly, Electrical Inspector for the United States Coast Guard, two days after the collision inspected the Bedford's electrical steering gear system and examined the wiring in the switch box and found the the wires in "very poor condition"; "* * * that rubber insulation has become brittle and easily broken if disturbed, and on two of these wires the insulation was off about $\frac{3}{4}$ of an inch, and so located that they could become grounded and cause a short circuit," and in his written report of April 11th recommended that all cables in the system found to be in poor condition be replaced and that the wires "in the transfer switch be grouped together in cable formation, wrapped with two layers of friction tape, and then given two coats of black insulating air drying varnish, lugs to be installed and secured with lock washers." On April 16th, United States Local Inspectors "Coast Guard" wrote the claimant's representative that the recommendation made by Inspector Farrelly were required and on June 30, the owner of the Bedford wrote the Local Inspectors that it had complied with these requirements.

The experts have testified that to have created a short circuit between wires 2 and 3 with a current of $\frac{1}{4}$ ampere at 220 volts, the wires must have come in contact and not merely a leakage of current from one of them to the other. When in contact the steering control failed to function, but this occurred only when the ship's port steering engine was in motion, so the reasonable inference is that the circuit was opened and closed when the wires came in contact through the vibration or movements of the ship.

It is quite true that A.E.G. steering system is recognized as a good one, and that such wires may last longer than twelve years, but claimant's witnesses, McCann, on December 6, 1939 reported that the wiring in the engine room "is in very poor condition and falls off the wires in the junction boxes wherever handled" and some 250 feet of the wire was renewed. The claimant urges that the conditions affecting the wiring in the engine were quite different from those in the steering engine room; that the electric lighting wires in the engine room were in continuous service, while the steering control wiring carried a minute intermittent service, and that the wiring in the engine room was subjected to heat which radiated from the lamps and from the engines. However, this was a diesel engine ship and from the testimony it appears that there is little, if any difference, in the temperature of the engine room and the steering engine room. The fact that the electric light wiring in the engine room was in continuous service while the wires in the transfer switch box were used intermittently might, to a limited extent, cause the insulation on the electric light wires to deteriorate sooner.

An examination of the wires of the transfer switch box does not refute the testimony of Farrelly, Electrical Inspector for the United States Coast Guard as to their poor condition. The general condition of the insulation and wires is the same as where removed from the Bedford, except for some of the breaks or ruptures of the insulation caused by normally flexing the wires in testing them. The claimant contends that the disappearance of the insulation on the now bare spots on wires 2 and 3 is accounted for by the short circuits which occurred in the tests made by McCann on April 10th after the discovery of the original short circuit, and the subsequent handling which knocked off the charred insulation. McCann admitted that after first seeing the smoke he saw small holes in the insulation on the wires where the insulation was charred. Whether the insulation had been worn by chaffing, cracked or broken away where the wires were bare of insulation when removed and to what extent cannot now be told as the heat from the several short circuits destroyed the evidence, but there must have been cracks or openings in the insulation on the wires when the steering gear first failed to function, as well as when McCann made his tests, for the short circuit to have occurred. The insulation on the wires in the switch box was hard and brittle; was liable to crack or break when bent, and the tape had become somewhat loose at points; as the wires were in a loose unseparated mass the vibration of the ship's engines or movements of the ship might well have caused the wires to rub against one another,

and if wires 2 and 3 came in contact where the insulation was ruptured or cracked apart a short circuit would have resulted and that this did happen is quite possible and is one reasonable inference.

Claimant urges that usual and frequent inspections of the wires disclosed no defect in the wires and that the possible causes are reduced to a manufacturing defect, mechanical injury or a hidden crack in the insulation under the winding tape, none of which could have been detected by a reasonable inspection by the eye or by hand. Claimant refers to the testimony that some minute blow holes were found in three other conductors taken from inside the armored cable. The idea that the short circuit in wires 2 and 3 was due to a manufacturing defect which caused no trouble until after twelve years of use seems remote.

If it be assumed that there were some minute blow holes in wires 2 and 3, a short circuit would be quite unlikely unless the insulation and winding fabric were in poor condition. The Bedford's witness suggested that someone in the course of inspection may have caused "a cracking in the insulation" in moving the wires aside so as to get at all the other wires. But here again this would not have happened if the insulation had been in proper condition.

The libelant urges that there was a failure to route and lack of any arrangement of the wires after they entered the switch box from the armored cable; that they should have been separately routed and secured to terminals.

The experts from Meanticut and those for the claimant differ as to the proper practice in routing, those for the libelant testifying that the wires should have been separately routed, while claimant's experts said that the Bedford's arrangement was recognized as good practice where the installation is enclosed as in a switch box, and the slack in the wires is allowed to permit readjustments and flexibility; also that the Bedford's arrangement afforded a better opportunity for visual-manual inspection of the wires. The Bedford's position is that the arrangement of the wires was a standard part of a recognized steering system, installed by a well known ship yard when the ship was built and that it was entitled to rely upon it as designed and installed; that when she was built the Bedford received the highest classification by Lloyd's; that the separation of the wires on terminals would have required the replacing of the switch box with a larger one of different design.

I do not think that the claimant was negligent in continuing to use the switch box and wiring system installed when she was built, provided her owner properly kept its parts up to standard and made reasonably sure that worn out wiring was renewed with fully insulated wires. Sieracki v. Seas Shipping Co., 3 Cir., 149 F.2d 98; The Mistral, 1932 A.M.C. 762, 769; See The William E. Reed, 2 Cir., 104 F.2d 167; The Beacon, D.C., 6 F.Supp. 779. It is apparent that the loose wires were likely to and did come in contact as a result of the movements of the ship or vibrations of the engines and might rub against one another or the binding block.

In such a system with its loose unseparated wires it was essential for the safety of the ship that the wires be well insulated; they were not. Insulation deteriorates with age and use, as was admittedly true of the wires in the engine room. The steering system operated satisfactorily when new, but parts subject to wear must be renewed when worn out—just as tires, spark plugs, etc., in a new motor car when worn out must be replaced with new ones.

Claimant urges that the trouble was not due to any fault on its part; that the usual proper inspections of the wires were made and the two standard tests were applied—visual-manual and by megger—and that no defect was revealed.

A megger test by measuring the flow of current between conductors reflects deterioration or defects in insulation provided the points of leakage are in such close contact that there is no air space between the points of leakage.

January 16, 1940, Lloyd's reports show survey including megger test completed and her classification continued. There is also testimony of megger tests having been made on October 27, 1941, and on March 10, 1942, by electrical contractors engaged in making repairs. According to the electrician employed by the contractor the megger tests were made from wire to wire and from wire to ground but he admitted that even if the insulation was broken on the two wires and there was any air gap between them, the megger test would not disclose the defect in the insulation or leakage, and several of the experts testified that unless the wires were pressed tightly together the defective insulation would not be shown by the megger

and it does not appear that the wires were so pressed together during these tests. The electrician also said that the most efficient method "is to run your finger up and down and find if there are any holes in it or burned spots on it" which he admitted he did not do.

There was a megger aboard the Bedford, but it was not used by the ship's personnel on the steering gear control wiring.

In addition to the survey by Lloyd's in January, 1940 [referred to above], there is a Lloyd's report dated July 20, 1941, of a survey and another report dated February 28, 1942, of one made on January 7, 1942, in both of which the "steering gear and its connections" were reported "Good." However, MacCorkindale, Lloyd's representative who made the last two surveys, testified that no megger test nor electrical equipment examination was made on either of these surveys. Lloyd's inspections in 1941 and 1942 apparently were not full surveys for although reports state the steering gear was examined, no electrical equipment was tested. In any event certificates of surveyors and inspectors are to be valued in the light of the actual facts disclosed. The Doris Kellogg, D.C., 18 F.Supp. 159.

The testimony for claimant is that the Bedford had for some time been making voyages between New York and Aruba and that on each voyage a visual-manual test of the steering gear control wiring was made at Aruba by her Chief Engineer or by the ship's electrician.

The Bedford's electrician testified that on April 6, 1942 he inspected every wire in the switch box after taking off the cover and found nothing wrong in the box nor any defect in the wiring of that box. Just how thorough the examinations of these wires were is open to question, for the hard brittle insulation which broke and cracked on flexing or bending must have been as apparent before as after the collision. He admitted that this inspection three days before the collision was the only such inspection he had ever made in New York, except when the Bedford was in dry dock. McDonough who made this examination—as well as those at Aruba—had a seaman's certificate but did not have an electrician's rating although he had had electrical experience in the British Navy from 1906 to 1919. According to the Bedford's deck log and the testimony of her Third Officer a routine operating test of the steering gear was made on the morning of April 9, before sailing from Bayonne and it was reported "in good order." The test consisted of repeatedly turning the wheel and watching the indicator. I think that the claimant has failed to sustain the burden of showing that the collision did not and could not have happened as a result of the loose poorly insulated wires coming in contact through the vibrations and movements of the ship, possibly worn or damaged from the wires rubbing against one another, or the binding block. That is what probably did happen—and I think that if the claimant had exercised the degree of care called for where this vital part of the ship was concerned, it should have discovered the poor condition of the wiring and provided against this probability or possibility.

What Judge A. N. Hand said in The Woodmancey, 1925 A.M.C. 1059 [reversed on other grounds, 18 F.2d 79] about a ship's cable, applies to the wiring in the steering gear control, "Stout, perfect ship's cable is vital to safe navigation, and most convincing proof must be offered to sustain the defense of inevitable accident." [1925 A.M.C. pp. 1060, 1061]. See also The City of Camden, 3 Cir., 292 F. 93.

The libelant Lykes Brothers Steamship Company, as owner of the Meanticut, and as bailee for certain cargo, and Amtorg Trading Corporation, intervening petitioner for cargo, may have a decree against the F. H. Bedford, Jr., Panama Transport Company, her owner, with the usual reference to a Commissioner as to damages. The cross-libel is dismissed.

Proposed findings of fact and conclusions of law to be submitted promptly by the prevailing party.