**MARYLAND SHIPBUILDING & DRY-DOCK COMPANY, a body corporate, Libellant,**

v.

**PATAPSCO SCRAP CORPORATION, a body corporate, Owner of THE S.S. ISAAC T. MANN, Respondent.**

No. 3924.

United States District Court
D. Maryland.

Jan. 13, 1959.

George E. Beechwood, Beechwood & Lovitt, Philadelphia, Pa., William B. Rafferty, Miles & Stockbridge, Baltimore, Md., for libellant.

David R. Owen, James D. Peacock, Semmes, Bowen & Semmes, Baltimore, Md., for respondent.

R. DORSEY WATKINS, District Judge.

On October 15, 1954, at about 4:10 p.m. the S.S. Isaac T. Mann (Mann), owned by the respondent (Patapsco) and moored at its pier No. 3 in Baltimore harbor, broke loose from its moorings, drifted across the Patapsco River and collided with the pier of the Maryland Shipbuilding & Drydock Company (Maryland) causing damages in the agreed amount of $86,000. On April 24, 1957 Maryland sued Patapsco for these damages alleging that they occurred without any fault on the part of Maryland and were solely caused by the fault, neglect and want of care on the part of Patapsco in that the Mann was improperly manned, equipped and moored; those in charge of her were incompetent and inattentive; and that notwithstanding notice of impending high winds, those in charge of the Mann failed to take proper and sufficient precaution under the circumstances to prevent the Mann from breaking her moorings.

### The Law.

■ The collision of the Mann with the stationary pier of Maryland "called for an explanation" by Patapsco. The Havana, 2 Cir., 1937, 89 F.2d 23, 24. Usually, it is said that such a collision raises a "presumption" against the moving vessel. Gilmore and Black, Law of Admiralty (1957), p. 398; United States v. Eastern Transportation Co., D.C.D. Md.1943, 50 F.Supp. 815, 816, 817; Cranberry Creek Coal Co. v. Red Star Towing & Transportation Co., 2 Cir., 1929, 33 F.2d 272, 274, certiorari denied New York Marine Co. v. Cranberry Creek Coal Co., 1929, 280 U.S. 596, 50 S.Ct. 67, 74 L.Ed. 643. Patapsco must therefore be held responsible for the damage resulting from the collision unless it can "show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented." United States v. South Carolina State Highway Department, 4 Cir., 1948, 171 F.2d 893, 896; see also United States v. The Catherine, 4 Cir., 1954, 212 F.2d 89, 92–93. This burden is a heavy one. The Chickie, 3 Cir., 1944, 141 F.2d 80, 82; Swenson v. The Argonaut, 3 Cir., 1953, 204 F.2d 636, 640. Whether this is a shifting of the burden of proof to respondent, as is indicated in Baltimore & Ohio Railroad Company v. Pennsylvania Railroad Company, D.C.N.Y.1914, 1925 A.M.C. 926; The Beacon, D.C.D.Md.1934, 6 F.Supp. 779, 780; United States v. South Carolina State Highway Department, 4 Cir., 1948, 171 F.2d 893, 896 (vessel responsible "unless she can show affirmatively that the drifting was the result of inevitable accident * * *"); or whether it is merely an obligation of going forward, the ultimate burden of proof remaining upon Maryland; Griffin on Collison (1949), pp. 38–41; Cranberry Creek Coal Co. v. Red Star Towing & Transportation Co., 2 Cir., 1929, 33 F.2d 272, 274, certiorari denied New York Marine Co. v. Cranberry Creek Coal Co., 1929, 280 U.S. 596, 50 S.Ct. 67, 74 L.Ed. 643; United States v. Eastern Transportation Co., D.C.D.Md.1943, 50 F.Supp. 815, 817; The Cullen No. 32, 2 Cir., 1932, 62 F.2d 68, 70, affirmed without discussion of this point, 1933, Cullen Fuel Co. v. W. E. Hedger, Inc., 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189—is an interesting and perhaps difficult question. In the view the court takes of the facts, the result would be the same under either approach.

### Findings of Fact.

At all times relevant to this action Maryland was the owner of certain piers and appurtenances situated at its dock facilities on the Patapsco River in Baltimore Harbor, Maryland. Patapsco was the owner of three piers and other facil-

ities for mooring ships on the opposite side of the Patapsco River. Its Pier No. 3, 930 feet long, was the westernmost pier and extended from the land in a northeasterly direction.

On October 15, 1954 the Mann was, and for some time prior thereto had been, moored to the west side of Patapsco Pier No. 3, bow in, and her stern not extending beyond the end of the pier. The Mann had been purchased by Patapsco and was in process of being scrapped, the super-structure having been removed, but none of her mooring bitts, chocks or mooring rings had been affected. Her length was 377 feet, her breadth 55 feet, and her gross tonnage was 5,266, net tonnage 3,354. She was without anchors of any kind, did not have steam up, and was a dead ship, or hulk.

The Mann was moored with fasts or lines fixed to bollards on Pier No. 3 of Patapsco, the size, type and location of which lines are shown on respondent's Exhibits 4 and 5. All of the lines were in at least two parts. Thirteen separate lines were used, eleven of which had two parts and two of which had four parts. All the lines were of plow steel, except one which was 12″ manila rope. These lines had theretofore been taken from the equipment of the Mann or from the warehouse of Patapsco, the warehouse lines primarily having been obtained from other ships which had been scrapped. No evidence was offered as to their age, or the nature or extent of previous use; and none of the lines was offered in evidence.

The lines on the Mann were run through the ship's fittings (bitts and chocks), except in one instance where a four-part line through a shackle from the stem post was used. All the lines were fastened to bollards on the pier permitting them to be tended from the pier. Two of the lines were fastened to a bollard in the middle of the pier; four were fastened to bollards adjacent to the Mann; and seven at the time the Mann broke away were fastened to bollards on the far side of the pier. All of the lines had been subjected to visual inspection but to no other tests. The testimony on behalf of Patapsco was that immediately before the breaking away of the Mann all lines were apparently sound, without kinks, properly fastened, and apparently equalized.

For a considerable period of time prior to 4:10 p.m. on October 15, 1954 numerous warnings of the approach of Hurricane Hazel to Baltimore were given to the public through various media of communication. Patapsco had general knowledge of these warnings, including the general warning at 12:15 a.m. October 15, 1954 that the center of the storm would probably cross Maryland late in the afternoon, accompanied by "dangerously high winds and unusually high tides." The 6:00 a.m., 9:45 a.m. and 10:00 a.m. forecast referred to winds of 40 to 60 miles per hour; the 12:15 p.m. broadcast to "gale to hurricane force winds, which means winds above 40 miles per hour and gusts as high as 60 to 70"; and the 2:30 p.m. forecast, to winds which "will increase slowly to 40 to 60 miles per hour, with gusts to 60 to 70."

The lines were tended from time to time by Patapsco until about 2:00 p.m. when the breaking of waves under the piers and the force of the wind led to discontinuance of work on Patapsco's piers.

Just before the breaking away of the Mann, there had been a lull in the force of the wind. This was followed by a strong blow and the parting of lines on the Mann.[1] Lines numbers 6 and 10

---

[1.] Patapsco's testimony with respect to the sequence in which the lines parted was somewhat conflicting. Its only eyewitness to the parting of the lines initially testified that the order of parting, with reference to the numbers used on respondents' exhibits 4 and 5, was 3 – 2 – 1.

He changed this in the course of his testimony to 3 – 1 – 2. In the course of examination he was shown his signed statement prepared very shortly after October 15, 1954, in which the indicated order was 2 – 1 – 3. His final testimony placed the order as 3 – 1 – 2. Line 1

pulled the bollards, to which they were attached, out of the pier. The number six line to the bollard parted before the bollard had been pulled from the pier; line number 10 did not part and the bollard remained attached to it as the ship broke away. None of the lines which parted broke at either the ship's fittings or the bollards. The testimony did not otherwise disclose exactly where the breaking of the lines occurred.

The Mann drifted across the Patapsco River and collided with the pier and facilities of Maryland, causing damage in the agreed amount of $86,000. The parties have agreed that no fault on the part of Maryland caused or contributed to such damages.

Immediately upon the breaking away of the Mann, Patapsco endeavored to obtain the assistance of the Coast Guard and of tug boats but such assistance could not be obtained before the collision.

### Failure to Shift the Mann before 4:10 p.m.

■ Maryland has strongly contended that the failure of Patapsco to move the Mann to a different and safer berth was negligent. Under the circumstances the court finds as a fact and concludes as a matter of law that this contention is without merit.

Evidence was offered that on October 15, 1954 there were some four or five vacant berths to which the Mann could have been moved. There was, however, no testimony that any of these berths was safer than the one in which the Mann was moored. In view of the admitted unpredictability[2] of the path of a hurricane there is no legally sufficient evidence that the failure of Patapsco to out-guess Hurricane Hazel could be classed as negligence. Moreover, there was certainly no occasion to move the Mann before the morning of October 15, 1954. The testimony of one of the two harbor towing companies was that its tugs were not available in the morning and would not have gone out in the afternoon.[3]

The testimony of the other towing line was that it would have been difficult to obtain its services in the morning, and that it was doubtful if the men could have been persuaded to go out in the afternoon. In this connection it is also of some significance that no vessel comparable in size to the Mann was moved to a different berth on October 15, 1954; and that Maryland, which had a number of vessels moored in position relatively the same as the Mann, did not feel it was necessary to move them.

### Failure to Take Other Precautions.

■ Maryland also urged that anchors should have been thrown out from the Mann and/or that the Mann should have been sunk at the pier.

The court finds from the weight of the credible evidence that even if at any time before the Mann broke away it might have been desirable to anchor her, this was not feasible. The Mann did not have

---

was the 12″ manila rope line; 2 was a four-part wire line to the stem post shackle, and No. 3 was a two-part wire line. Maryland strongly criticized the No. 2 line because of alleged possibility of kinking or of binding because of the large diameter of the line compared with the diameter of the shackle. In the view the court takes of the case, the order in which the lines parted may be of importance but is not critical.

When the lines began to part, only one employee of Patapsco was in the vicinity. The court finds as a fact and concludes as a matter of law that even if the lines had been fully tended at the time the first line parted, Patapsco could not there-

after by the use of reasonable care have prevented the parting of the remaining lines.

2. Within a period of five hours (4:00 p. m. – 9:00 p. m.) the wind varied from east-southeast to southeast to south-southeast to west to southwest.

3. This towing company had docked an incoming vessel at Maryland's piers at about noon on October 15, 1954. The high winds made this extremely difficult, and considerable damage was done to Maryland's drydock and piers in the docking. The tug was nearly swamped on its return trip.

any anchors or anchor lines on her, and did not have any steam up. Cranes would have been necessary to put out anchors, but to use cranes would have required the release of the seven lines which had been attached to the far side of the pier. Under the physical conditions existing it would not have been practical to have used anchors.

The court also finds that under the circumstances the failure to sink the Mann was not evidence of negligence. The evidence on behalf of Maryland did not make it clear whether the opening of sea cocks at the time it was allegedly necessary to do so, would have resulted in sinking the Mann before 4:10 p.m. This testimony made it at least as likely that efforts (at a time or times not clearly defined) to sink the Mann would have resulted in raising her bow far above water and would have subjected the forward lines to terrific leverage. Also, as will be developed later, the Mann could safely have been moored at Pier 3.

Adequacy of Piers and Moorings.

### Piers

Patapsco's Pier No. 3 was one of the newest piers in Baltimore Harbor. Initially designed in connection with the building and launching of ships, it had been strengthened to permit its use for dock trials. Inspection, maintenance and repair had been entrusted to a reputable contracting company on a cost-plus basis, and all recommended repairs were authorized and approved by Patapsco. An extensive survey had been made in 1952, in the course of which only ordinary wear and tear was found, which was repaired.

The bollard which was carried away had been set in 7-foot stringers. The other bollard, which pulled out but was not carried away, was set in 22-foot stringers. After the storm, both were replaced as they had been before.

Maryland had immediate access to, and had a survey made of, Pier No. 3.

### Mooring.

Promptly after the return of the Mann to Pier 3 on the night of October 15, 1954, Patapsco obtained from its employees full details of the nature and location of all mooring lines on the Mann immediately before it broke away. These data were later diagrammed on Respondent's Exhibits 4 and 5. The adequacy and propriety of the moorings was the subject of extended examination and much of the evidence.

Maryland offered testimony through a sea captain[4], and a retired admiral, as to the impropriety of the mooring shown by Patapsco's evidence. Neither was well acquainted with Baltimore Harbor, and the admiral had had little practical experience (as distinguished from naval technical responsibility by virtue of official position) with the mooring of small merchant ships, or dead hulks. Their common criticism related to the use of too many lines, making it difficult, if not impossible, to equalize them; and the absence of any proper aft spring line.[5] They conflicted on the desirability of multi-part wire lines.

Patapsco offered testimony of its own company expert, who testified in substance that the locations and types of lines used were proper; that if in good condition they could be expected to hold at 70 miles per hour "or more"; and that he had no other recommendations.

4. He had formerly been employed by the parent corporation of which Patapsco is a wholly-owned subsidiary. He denied any animosity toward the parent corporation, although he was then "in process of filing suit against" it, which he intended to prosecute to conclusion.
5. The testimony of Patapsco's witnesses was that there was no fore and after motion of the MANN before she broke away. It would appear that if such were the case, the absence of an aft spring line could not have been significant. The admiral refused to answer questions along these lines; and insisted upon his conclusion that there must have been a very substantial drift aft.

Patapsco also offered the testimony of the head of a rigging company that services approximately 85% of the dockings and undockings in Baltimore Harbor.[6] He testified that enough ropes were used to make three ships fast; to hold two vessels in a 70-mile wind; that he had never seen so many on a ship, and would not himself have put out as many unless ordered to do so. There were enough lines and leads for 60–70 mile winds, "if something did not give"—bitts, lines or pier. He would have used the same general moorings, but only eight or nine, or ten at the most.

■ By way of summary, Maryland criticized the manner of mooring, not because of an insufficient number of lines, but an excess of lines, and their location, making equalization difficult or impossible; the absence of a proper aft spring line; and the use of multi-part steel lines. Patapsco offered evidence of proper mooring (with a caveat by one of its experts as to excessive lines) sufficient to withstand wind forces in excess of 70 miles per hour,—unless "something gave". As individuals, Patapsco's witnesses were more impressive from the stand, and were it simply a matter of choice between conclusory testimony of "proper" or "improper" procedure, the court would be inclined to find for Patapsco.[7] But on Patapsco's own testimony, if reasonable care had been taken, so that the lines shown on Respondent's Exhibits 4 and 5:

1) Were placed as shown on said Exhibits;

2) Were of the physical composition indicated on those Exhibits;

3) Were sound;

4) Were properly placed on the ship—and pier moorings—that is, were

(a) properly run and fastened, and

(b) equalized; and

5) The ship and pier moorings (including therein the pier structures in which the bollards were fastened) were adequate—

then, the Mann would have remained moored in a wind of 70 miles per hour or more.[8]

But the Mann broke away. Therefore, one or more of the foregoing factors must have been missing. Which one or more was or were responsible cannot be stated with certainty. In order of probability, the court would place unequalized lines first, and defective lines (kinking; use of scrapped equipment) second.

Patapsco does not contend that its duty required it to moor the Mann to withstand winds up to 70.0 but not 70.1 miles per hour. It does strenuously urge that there is the possibility of gusts greatly in excess of 70 miles, which might have caused the Mann, though properly moored, to break away.[9] The only records of wind velocities are:

1. Friendship Airport, the official weather station nearest to (about seven miles southwest of) Patapsco's piers:

---

6. He had originally been subpoenaed by Maryland. As he would probably like to obtain Patapsco's business, he had every incentive to be critical of how Patapsco's force performed mooring operations.

7. At the conclusion of the case, and in stating to counsel the court's tentative conclusions, the court frankly stated that it would like to find for Patapsco, if it could, but doubted if the facts would permit this.

8. In the trial, Maryland referred to high tides as a contributory factor. However, at 4:10 p.m. the tide was only 3.5 feet above mean low water. Such affirmative testimony as there is indicated, and the court finds, that tides played no causative role in the breaking away of the Mann.

9. No other ship in the Harbor broke completely loose of its moorings.

| Time | Average wind velocities for one minute in miles per hour ("Fastest Mile") | Gusts in Miles per hour |
|---|---|---|
| 3:25 P.M. | 41 | 56 |
| 3:55 P.M. | 40 | 49 |
| 4:28 P.M. | 45 | 70 |
| 5:00 P.M. | 45 | 70 |

2. The Chesapeake Bay Bridge anemometer, 21 miles southeast of Patapsco's piers, of the permanent graph recording type, showed the following gusts in excess of 60 miles per hour between 4:00 and 4:30 p.m.:

| | |
|---|---|
| 4:05 | 61 |
| 4:07 | 62 |
| 4:08 | 67 |
| 4:10 | 66 |
| 4:13 | 61 |
| 4:14 | 61 |
| 4:15 | 63 |
| 4:16 | 63 |
| 4:17 | 75 |
| 4:18 | 65 |
| 4:22 | 69 |
| 4:28 | 69 |
| 4:29 | 73 |

Patapsco's witnesses, with laudable candor [10], did not attempt to approximate any gusts in terms of miles per hour.

The court therefore finds that the weight of the credible evidence requires the conclusion that the Mann was not, under the circumstances, properly moored, and such faulty mooring permitted the breaking loose of the Mann, its collision with the piers of Maryland, and damage thereto in the amount of $86,000, for which judgment should be entered for Maryland.[11] This conclusion follows regardless of whether the burden of proving lack of fault is cast upon Patapsco, or whether the general burden of proof remains upon Maryland.

### Interest.

The parties are in agreement that the allowance or withholding of interest from the date of collision to the date of judgment is within the discretion of the court; and see, 3 Benedict on Admiralty (6th Edition), p. 191. The court exercises its discretion adversely to the allowance of interest in this case because, although the collision occurred on October 15, 1954, suit was not filed until April 24, 1957, and no effort was made by Maryland for nearly a year thereafter to bring the suit to trial; the apparently meticulously determined claim of $92,894.14 was more than $6,000 in excess of the agreed damage; and Maryland's claim, and this libel, were reasonably and in good faith contested.

10. Whether Patapsco's witnesses could have qualified to testify in terms of miles per hour is doubtful—but no effort was made so to do. The court repeats its commendation, expressed at the close of the trial, of the unusual honesty of these witnesses, both in this particular instance, and in many others when less candid witnesses might have yielded to the temptation to stretch the truth, with little chance of possible contradiction.

11. The court does not consider the decision in the Anna Maersk, D.C.Md.1934, 1934 A.M.C. 166, to be in conflict with this conclusion. In that case the court appears to have held that the insufficiency of the pier, rather than inadequate mooring, was the proximate cause of the breaking loose of the ship. In this case, Patapsco would be liable if a negligently inadequate pier or mooring, either or both, was or were responsible for the breaking away of the MANN.

### Conclusions of Law.

1. The court has jurisdiction of the parties and of the subject matter of the litigation.

2. The Mann was not properly moored by Patapsco.

3. Such faulty mooring was the sole proximate cause of damage to Maryland's pier and appurtenances.

4. The damages sustained by Maryland were $86,000.

5. Maryland is not entitled to interest from the date of collision to the date of this judgment.

Let judgment be entered in favor of Maryland against Patapsco in the amount of $86,000, but without interest to date of judgment.

The court has considered the proposed findings of fact and conclusions of law submitted by Maryland and Patapsco, and has incorporated in the foregoing opinion such as it considers appropriate. Those not so incorporated are hereby denied.

The foregoing opinion incorporates the court's findings of facts and conclusions of law under Admiralty Rule 46½, 28 U.S.C.A.